UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| ANA L. DIONICIO and ALEJANDRO M. WESAW, individually, and as a representative of a Class of Participants and Beneficiaries of the U.S. Bank 401(k) Savings Plan, <br><br> Plaintiffs, <br><br> vs. <br><br> U.S. BANCORP, <br><br> and <br><br> BOARD OF DIRECTORS OF U.S. BANCORP, <br><br> and <br><br> U.S. BANCORP'S BENEFITS ADMINISTRATION COMMITTEE AND U.S. BANCORP'S INVESTMENT COMMITTEE, <br><br> Defendants | Case No. <br><br><br> <u>CLASS ACTION COMPLAINT</u> |

## COMPLAINT

COMES NOW Plaintiffs, Ana L. Dionicio and Alejandro M. Wesaw ("Plaintiffs"), individually and as representatives of a Class of Participants and Beneficiaries of the U.S. Bank 401(k) Savings Plan (the "Plan" or "U.S. Bank Plan"), by their counsel, WALCHESKE & LUZI, LLC, and MILLER & STEVENS, P.A., as and for a claim against Defendants, alleges

and asserts to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1.     Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

2.     The ERISA fiduciary duty of prudence governs the conduct of plan fiduciaries and imposes on them "the highest duty known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982.)

3.     The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* (*citing Tibble v. Edison Int'l*, 575 U.S. 523 (2015).)

4.     Even in a defined contribution plan in which participants are responsible for selecting their plan investments, ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fiduciaries are required to conduct *their own independent evaluation* to determine which investments may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (*citing Tibble*, 575 U.S. at 529–530) (emphasis added.) "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time," fiduciaries "breach their duty [of prudence]." *Id.*

5.        Defendants, U.S. Bancorp ("U.S. Bank"), the Board of Directors of U.S. Bancorp ("Board"), the U.S. Bancorp's Benefits Administration Committee, and the U.S. Bancorp's Investment Committee (collectively "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as the U.S. Bank 401(k) Savings Plan (the "Plan" or "U.S. Bank Plan") – that it sponsors and provides to its employees.

6.        During the putative Class Period (January 5, 2017, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping [and administrative (RKA) and managed account] fees," *Hughes*, 142 S. Ct. at 739-740, and by failing to remove their high-cost recordkeeper, Alight Solutions ("Alight")[1], and their high-cost managed account service provider, Alight Financial Advisors ("AFA").

7.        These objectively unreasonable recordkeeping and managed account fees cannot be contextually justified, and do not fall within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 142 S. Ct. at 742.

8.        Defendants breached their fiduciary duty of prudence by causing the Plan participants to pay excessive RKA and managed account fees.

9.        Defendants unreasonably failed to leverage the size of the Plan to pay reasonable fees for Plan RKA and managed account services, and by undertaking a competitive bidding process to see if same level and quality of services could be had by the Plan for less.

---

[1] Based on Form 5500s dating back to 2009, Alight, or its predecessor corporation, Hewitt Associates, have been the recordkeeper for the Plan for fifteen years or more.

10.     ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating RKA and managed account fees based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

11.     There is no requirement to allege the actual inappropriate fiduciary actions taken because "[i]t would be perverse to require plaintiffs bringing [ERISA] claims to plead facts that remain in the sole control of the parties who stand accused of wrongdoing." *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 602 (8th Cir. 2009).

12.     The unreasonable RKA and managed account fees paid inferentially and plausibly establishes that an adequate investigation would have revealed to a reasonable fiduciary that the Plan services, given their level and quality, were improvident.

13.     These breaches of fiduciary duty caused Plaintiffs and Class Members tens of millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees and expenses.

14.     To remedy these fiduciary breaches, Plaintiffs bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq*.

16.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

17.     Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

18.     In conformity with 29 U.S.C. §1132(h), Plaintiffs served this Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

19.     Plaintiff, Ana L. Dionicio, is a resident of the State of California and currently resides in Orange, California, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

20.     Plaintiff Dionicio had been a Teller, Lead Teller, and a Personal Banker I at U.S. Bank locations at 100 W Lincoln Ave, Anaheim, CA 92805, 2470 N Grand Ave, Santa, CA 92705, and 8460 La Palma Ave Buena Park CA 90620, from May 2012 through June 2018.

21.     During the Class Period, Plaintiff Dionicio invested in the Target Retirement Income Fund, the Target Retirement Date 2055 Fund, and the Target Retirement Date 2060 Fund.  She rolled her assets out of the Plan in November 2018.

22.     Plaintiff, Alejandro M. Wesaw, is a resident of the State of California and currently resides in Beaumont, California, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

23.     Plaintiff Wesaw worked at U.S. Bank from May 2016 through August 2022 in the Military Leadership Development Program (2016), and was a Branch Manager from 2017 until August 2022. He worked in 2016 at Hemet, CA, from 2017- January 2022 in Palm Springs, CA, and from January 2022 to August 2022 in Beaumont, CA.

24.     During the Class Period, Plaintiff Wesaw invested in the Target Retirement Date 2050 Fund, the US Large Cap Equity Index, the US Small-Mid Equity Index, and the International Equity Index. He also participated in the managed account service, Professional Management, offered by AFA during this same period. He rolled his assets out of the Plan in October 2022.

25.     Plaintiffs have Article III standing to bring this action on behalf of the Plan because they both suffered actual injuries to their Plan account through paying excessive RKA fees during the Class Period and Plaintiff Wesaw also paid excessive managed account fees. Those injuries are fairly traceable to Defendants' unlawful conduct in maintaining Alight as its recordkeeper and AFA as it managed account provider, and that harm is likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiffs and Class.

26.     Having established Article III standing, Plaintiffs may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond their own injuries.

27.     The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive RKA and managed account fees) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

28.     Having never managed a mega 401(k) Plan, meaning a plan with over $500 million dollars in assets, *see Center for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022) ("Mega plans have more than $500 million in assets"), Plaintiffs, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

29.     U.S. Bancorp ("U.S. Bank") is an American bank holding company based in the Minneapolis, Minnesota area, and incorporated in Delaware. It is the parent company of U.S. Bank National Association and is the fifth largest banking institution in the United States.  On the Plan's 2021 5500 form, it lists its address as 4000 West Broadway Avenue, Robbinsdale, MN 55422. In this Complaint, "U.S. Bank" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

30.     U.S. Bank acted through its officers, including the Board of Directors, to perform Plan-related fiduciary functions in the course and scope of their business. U.S. Bank and its Board appointed other Plan fiduciaries on the U.S. Bancorp's Benefits Administration Committee and U.S. Bancorp's Investment Committee (collectively "Plan Committees"), and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees.  For these reasons, U.S. Bank and its Board are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

31.     The Plan is administered by the Company's Benefits Administration Committee and has investment oversight by the Investment Committee.  As the Plan Administrators, the Plans Committees are fiduciaries with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). The Plan Committees have authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

32.     The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that U.S. Bank's contributions to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of

participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

33.     In 2021, the Plan had about $9,869,704,841 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had substantial bargaining power regarding Plan fees and expenses. Defendants, however, did not regularly monitor Alight and AFA to ensure that Alight and AFA remained the prudent and objectively reasonable choices.

34.     With 86,195 participants in 2021, the Plan had more participants than 99.99% of the defined contribution Plans in the United States that filed 5500 forms for the 2021 Plan year. Similarly, with $9,869,704,841 in assets in 2021, the Plan had more assets than 99.99% of the defined contribution Plans in the United States that filed 5500 forms for the 2021 Plan year.

## ERISA'S FIDUCIARY STANDARDS IN THE DEFINED CONTRIBUTION INDUSTRY

35.     Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. An employer may also make matching contribution based on an employee's elective deferrals.

36.     Employees with money in a plan are referred to as "participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

37.     Although U.S. Bank contributed significant amounts in employer matching contributions to Plan participants during the Class Period, these matching contributions are irrelevant to whether a Plan has paid excessive plan RKA or managed account fees.

38.    While contributions to a plan account and the earnings on investments will increase retirement income, fees and expenses paid by the plan may substantially reduce retirement income. Fees and expenses are a significant factor that affect plan participant's investment returns and impact their retirement income.

39.    Employers must: (1) establish a prudent process for selecting investment options and service providers; (2) ensure that fees paid to service providers, like recordkeepers, are reasonable in light of the level and quality of services provided; and (3) monitor investment options and service providers once selected to make sure they continue to be prudent choices.

## Recordkeeping and Administration ("RKA") Services

40.    Defined contribution plan fiduciaries of mega 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of mega retirement plans with a prudent and materially identical level and caliber of services. Alight is one such recordkeeper.

41.    These recordkeepers deliver all the essential recordkeeping and related administrative ("RKA") services through standard bundled offerings of the materially identical level and quality as other recordkeepers who service mega plans.

42.    The fees charged by recordkeepers for RKA services are impacted by 1) the costs of providing the RKA services; 2) the competitive environment related to what other recordkeepers would charge to provide materially identical services; and 3) the revenues that a recordkeeper can generate from both the recordkeeping fees as well as other ancillary revenue based on the potential to manage proprietary investment options in the plan.

43.    Recordkeepers determine their willingness to accept fees for providing RKA services based on an evaluation of the potential profitability of a retirement plan services relationship.

44.    Providing RKA services involves both fixed and variable costs.  The more participants in a plan, the greater proportion of the costs are variable costs which, in turn, means the closer the average cost per participant approaches the variable cost per participant.

45.    All else being equal, the more participants a plan has, a recordkeeper will be able to provide a lower fee per participant to provide identical RKA services to maintain the same profit margin rate.

46.    As a result, it is axiomatic in the retirement plan services industry that the more participants in a plan, the lower the effective RKA fee per participant the plan can negotiate. All prudent plan fiduciaries and their consultants and advisors are aware of this industry dynamic.

47.    There are two types of essential RKA services provided by all recordkeepers. The first type, "Bundled RKA" services, include:

a.    Recordkeeping;

b.    Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c.    Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d.    Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.      Maintenance of an employer stock fund;

f.      Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.      Plan consulting services including assistance in selecting the investments of-fered to participants;

h.      Accounting and audit services including the preparation of annual reports, e.g., Form 5500;

i.      Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan;

j.      Compliance testing to ensure the plan complies with Internal Revenue nondis-crimination rules; and

k.      Trustee / custodian services.

48.     According to the April 28, 2022 U.S. Bank 401(k) Savings Plan Annual Fee Disclosure Notice, the Plan's RKA fees include "[a]dministrative expenses: Fees paid to the recordkeeper to cover expenses for things like keeping data on participants, communication materials, internet services, and assisting participants with transactions; fees paid to a trus-tee to manage some operations of the Plan including trading and holding assets; plus fees paid for legal and accounting services." *Id.* at 7. The Plan thus provided all standard Bundled RKA services just like all other similar mega 401(k) plans.

49.     The second type of essential RKA services, hereafter referred to as "A La Carte services," provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees). These "A La Carte RKA" services typically include the following:

a.      Loan processing;

b.      Brokerage services/account maintenance;

    c.      Distribution services; and

    d.      Processing of Qualified Domestic Relations Orders (QDROs).

50.    The sum of the total Bundled RKA fees plus the total A La Carte RKA fees equals the total RKA fees.

51.    According to the April 28, 2022 U.S. Bank 401(k) Savings Plan Annual Fee Disclosure Notice, the Plan provided all such standard A La Carte services, just like all other similar mega 401(k) plans.

52.    As the retirement plan services industry evolved over the past forty-plus years, the recordkeepers have developed automated or semi-automated processes for providing RKA services.

53.    In practice, there are no material difference between the services that are offered and provided by national recordkeepers.  Rather, some recordkeepers may differ in *how* they deliver the services.

54.    As an example, because the RKA offering are materially identical among all recordkeepers who provide services to large plans, like the U.S. Bank plan, it is the standard and prevailing practice for retirement plan consultants and advisors (experts in the retirement plan industry) to request quotes by asking what the recordkeeper's "revenue requirement" is on a per participant basis for providing the Bundled RKA services.

55.    Similarly, in most cases differences in fee rates for the A La Carte services are immaterial in determining the total fees charged by recordkeepers.  To the extent that some recordkeepers have charged higher fees for these services, when those recordkeepers are in a competitive situation (in which they may not win the business), they will reduce their A La Carte fee rates to be competitive with what others are charging.

56.     The same is true for the Bundled RKA fee rates charged by recordkeepers. Retirement plan consultant and advisors primarily use the Bundled RKA fee rate of different recordkeepers to make fee rate comparisons and determine whether the Bundled RKA fee rate is reasonable.

57.     This approach is validated by the structure of the RFPs sent out by retirement plan consultants and advisors and the responses provided by the recordkeepers and then the summary of the evaluations created by the retirement plan consultants and advisors.

58.     For mega plans, like the U.S. Bank Plan, any immaterial variations in the way certain services are received by one plan compared to another plan have an immaterial impact on the reasonable market rate for Bundled RKA services.

59.     As a result, comparisons of the fees paid by similar sized plans are meaningful and provide a reasonable basis for determining whether an inference of imprudence is warranted based on the RKA fees being paid by any specific plan.

60.     Additionally, any minor variation in the level and quality of Bundled RKA services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers.

61.     Since well before 2015, industry experts have maintained that for mega retirement plans like the U.S. Bank Plan, prudent fiduciaries treat Bundled RKA services as a commodity with little variation in price. "Custody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

62.   Industry experts know that recordkeeping services have become a commodity for retirement plan fiduciaries; virtually every major recordkeeper provide the same core services. See, e.g., Allen Steinberg, *Unchecked Revenue: Show Me the Fees*, https://blog.retireaware.com/2018/01/12/unchecked-revenue/ (last visited Sep. 15, 2022); Fred Barstein, Investment News, *Potential Pru Retirement Sale a Cautionary Tale of a 401(k) Innovator*, https://www.investmentnews.com/prudential-retirement-sale-cautionary-tale-innovatio-205453 (Apr. 20, 2021) ("It is no wonder, but certainly disappointing, that one of the industry's most innovative providers, Prudential Retirement, is reportedly exploring a sale. That highlights how much record keeping has become a commodity focused on scale and costs.").

63.   Fidelity, the largest 401k recordkeeper in the country, has conceded that the RKA services that it provides to mega Plans are commodified, including to its own Plan for its own employees.

64.   As part of stipulated facts in another case, it stated: "The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year, and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year. *Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity it could have obtained recordkeeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).*" See *Moitoso v. FMR LLC, et al.*, 1:18-CV-12122-WGY, Stipulation of Facts, Dkt. 128-67, at 4-5 (D. Mass. Sep. 6, 2019) (emphasis added).

65.    All recordkeepers quote fees for the Bundled RKA services on a per participant basis without regard for any individual differences in services requested, which are treated by the recordkeepers as immaterial because they are inconsequential from a cost perspective to the delivery of the Bundled RKA services.

66.    Because dozens of recordkeepers can provide the complete suite of required RKA services, plan fiduciaries can ensure that the services offered by each specific record-keeper are apples-to-apples comparisons.

67.    Plan fiduciaries request bids from recordkeepers by asking what the record-keeper's Bundled RKA revenue requirement is to administer the plan.

68.    The U.S. Bank Plan had a standard level of Bundled RKA services, providing recordkeeping and administrative services of a nearly identical level and quality to other recordkeepers who also serviced mega plans during the Class Period.

69.    There is nothing disclosed in the Participant section 404(a)(5) fee and service disclosure documents that suggests that the annual administrative fee charged to partici-pants included any services that were unusual or above and beyond the standard record-keeping and administrative services provided by all national recordkeepers to mega plans with more than $500,000,000 in assets.

70.    Accordingly, comparisons of the Total RKA fee rate of different, similarly sized plans can provide meaningful information to help a plan fiduciary understand how its fees compare to a range of RKA fees without regard for minor and immaterial service level vari-ation.

71.    By the start of, and during the entire Class Period, the level of fees that record-keepers have been willing to accept for providing RKA has stabilized, and has not materially changed for mega plans, including the U.S. Bank Plan. Reasonable recordkeeping fees paid

in 2018 are representative of the reasonable fees during the entire Class Period. *See The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2020*, ICI Research Perspective, at 4 (June 2021).

72.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

73.     The U.S. Bank 2022 404(a)(5) fee and service disclosure defines "asset-based fees" as "[f]ees that are charged as a percent of holdings in an investment to cover investment management fees." (emphasis added). The same document states that, "[i]n addition to the fees that are charged against an account, there are certain fees that apply to the Plan's investment options."

74.      Recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."  The U.S. Bank Plan paid both direct and indirect RKA fees during the Class Period.

75.     The amount of compensation paid to recordkeepers must be *reasonable* (not the cheapest or the average in the market).

76.     Reasonable, in turn, depends on contextually understanding the market for such RKA services at the time that the recordkeeping contract or administrative services agreement ("ASA") is entered into with the recordkeeper, and then periodically thereafter.

## Managed Account Service Fees

77.     During the Class Period, Defendants selected and made available to Plan participants managed account services called Professional Management through AFA.

78.     In general, managed account services are investment services under which a participant pays a fee to have a managed account provider invest his or her account in a portfolio of preselected investment options.

79.     Managed account providers "generally offer the same basic service—initial and ongoing investment management of a 401(k)-plan participant's account based on generally accepted industry methods." The United States Government Accountability Office ("GAO"), *401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts*, at 14 (June 2014), available at https://www.gao.gov/assets/670/664391.pdf.

80.     According to the April 28, 2022 U.S. Bank 401(k) Savings Plan Annual Fee Disclosure Notice, "Professional Management fees: If you sign up for Professional Management offered by Alight Financial Advisors, you will be charged a fee that is based on the size of your account. This fee will be deducted from your 401(k) account each month." The first $100,000, .60%, the next $150,000, .45%, more than $250,000, .30%.

81.     In practice, little to no material customization is provided to the vast majority of plan participants which results in no material value to most participants relative to the fees paid.

82.     Managed account services, like AFA's, merely mimic the asset allocations available through a target date fund while charging additional unnecessary fees for their services.

83.     Participants who sign up for managed account services are generally charged an annual fee that is a percentage of the participant's account balance regardless of which investment approach they choose.

84.     The Plan participant has no control over the fee rate they are charged. The fee levels are determined at the Plan level through a contractual agreement between AFA and the Plan fiduciaries.

85.     For at least the past decade, mega plans have been able to negotiate multiple facets of the fees charged by managed account providers.

86.     Managed account services are offered by covered service providers to increase the revenue they generate through their relationship with a retirement plan, as Alight does.

87.     Alight promotes its managed account services over other potential solutions because the covered service provider will earn more revenue when participants use the managed account services.

88.     As with any service provider, one of the most important factors when selecting a managed account provider is fees. Managed account services have historically been expensive compared to other alternatives, such as target date funds that provide the materially same service at a much lower cost.

89.     As with RKA services, prudent fiduciaries regularly monitor the amount of managed account service fees the plan is paying and ensure the fees are reasonable compared to what is available in the market for materially identical services.

90.     The most effective way to ensure a plan's managed account service fees are reasonable is to periodically solicit bids from other managed account service providers, stay abreast of the market rates for managed account solutions, and/or negotiate most-favored nation clauses with the managed account service providers and/or the recordkeepers.

91.     Defendants caused U.S. Bank Plan participants, including Plaintiff Wesaw, to pay excessive fees for managed account services to AFA.

92.     Defendants could have reduced these fees charged by AFA by periodically soliciting bids from other managed account service providers and/or staying abreast of the market rates for managed account solutions to negotiate market rates, or by just offering target date funds instead

93.     The excessive fees paid by Plan participants to AFA using the Professional Management service were not objectively reasonable and breached Defendants' fiduciary duties of prudence to Class members, causing tens of millions of dollars of lost retirement account funds.

## THE PLAN

94.     During the entire Class Period, the Plan received RKA services from Alight and managed account services in the form of Professional Management from Alight's wholly-owned subsidiary, Alight Financial Advisors ("AFA").

95.     At all relevant times, the Plan's RKA and managed account fees were objectively unreasonable and excessive when compared with the fees paid by other comparable 401(k) plans that had similar numbers of plan participants.

96.     The fees were also excessive relative to the level and quality of RKA and managed account services received since the same level and quality of services are provided to all mega plans, like the U.S. Bank Plan, and any minor variation with respect to the use of components of the standard offering 1) do not impact the Total RKA fee rates; and 2) are virtually always immaterial as it relates to the Total RKA fee rates and cannot reasonable explain the disparity between what the Plan paid and the market rate for the services received.

97.     This is true regardless of the specific service codes listed by the plan on the Form 5500. *See* Droblyen, *supra*; Steinberg, *supra*; Barstein, *supra*.  For example, all record-keepers provide communications to plan participants but Alight does not list service code "38 Participant communication" in the Plan's 2021 Form 5500.

98.     These excessive Plan RKA and managed account fees led to lower net returns than the rates enjoyed by participants in comparable 401(k) plans.

99.     During the Class Period, Defendants breached their duty of prudence to the Plan, to Plaintiffs, and all other Plan participants, by authorizing the Plan to pay objectively unreasonable fees for RKA and managed account services.

100.    Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan participants and their beneficiaries, breached their fiduciary duties of prudence in violation of Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and caused Plaintiffs and members of the Class tens of millions of dollars of harm to their Plan accounts.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING RECORDKEEPERS

101.    Prudent plan fiduciaries ensure they are paying only reasonable fees for record-keeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan.  *See, e.g.,* U.S. DEPARTMENT OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 6, https://www.dol.gov/sites/dol-gov/files/EBSA/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited Oct. 10, 2022) ("Once you have a clear idea of your requirements, you are ready to begin receiving estimates from prospective providers. Give all of them complete and identical information about your plan and the features you

want so that you can make a meaningful comparison. This information should include the number of plan participants and the amount of plan assets as of a specified date.")

102.   Prudent plan fiduciaries can easily receive a quote from other recordkeepers to determine if their current level of recordkeeping fees is reasonable in light of the level and quality of recordkeeper fees. It is not a cumbersome or expensive process.

103.   It is the standard of care prevailing among industry experts to solicit competitive bids every three to five years. *See* CapTrust, *Understanding and Evaluating Retirement Plan Fees | Part One: A Holistic Approach*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-one-a-holistic-approach/ (stating "best practice is . . . a more formal recordkeeper search and selection process conducted approximately every three to five years. Recordkeeping and administrative fees should be evaluated and compared to plans of similar size and type that are receiving analogous services. While each plan is unique—making an apples-to-apples comparison imperfect—evaluating fees against similarly situated and sized plans provides a good reference point in helping to determine if plan fees are reasonable.").

104.   Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same (or better) level and qualities of services for a more competitive reasonable fee if necessary.

105.   A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated recordkeeping fees. To receive a truly "reasonable" recordkeeping fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis.

106.   Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

107.   First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

108.   Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

109.   Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

110.   Accordingly, the only way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of RKA services is to obtain competitive bids from other providers in the market.

## PLAN FIDUCIARIES DID NOT EFFECTIVELY MONITOR BUNDLED RKA FEES AND THE PLAN THUS PAID UNREASONABLE BUNDLED RKA FEES

111.   A plan fiduciary must continuously monitor its RKA fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

112.    During the Class Period, Defendants failed to regularly monitor the Plan's Bundled RK&A fees paid to Alight.

113.    During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Alight, in order to avoid paying unreasonable Total RK&A fees.

114.    During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively unreasonable RKA fees it paid to Alight and in light of the level and quality of RKA services it received.

115.    As set forth in the table below, from the years 2016 through 2021, based upon publicly available information in the Plan's DOL 5500 Forms, the Plan paid an effective average annual Total RKA fee of $41 per participant. These amounts are calculated by the Plan's Form 5500 filings and indicate the total RKA fees (the sum of the Bundled RKA fees and the A La Carte RKA fees).[2]

### Total Recordkeeping and Administration (Total RKA) Fees

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Average |
|---|---|---|---|---|---|---|---|
| Participants | 85,128 | 86,609 | 95,689 | 86,256 | 84,025 | 86,195 | 87,317 |
| Est. Total RKA Fees | $3,856,199 | $4,098,137 | $3,633,448 | $3,567,104 | $3,269,156 | $3,154,480 | $3,596,421 |
| Est. Total RKA Per Participant | $45 | $47 | $38 | $41 | $39 | $37 | $41 |

116.    From the years 2016 through 2021, based upon publicly available information in the Plan's DOL 5500 Forms in similarly sized plans and the accompanying financial statements, the table and graph below illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual Total RKA fee of around $23 per participant for a

---

[2] "Est. RKA Fees" on the above chart are taken directly from the audited Financial Statements attached to the U.S. Bank 401(k) Plan Form 5500s. The amounts are recorded as "Administrative expenses" on the Statements of Changes in Net Assets Available for Benefits which are audited by Ernst & Young LLP, an independent registered public accounting firm.

materially identical level and quality of Total RKA services, if not lower.

### Comparable Plans' RKA Fees Based on Publicly Available Information from Form 5500
(Price calculations are based on 2018 Form 5500 information or the most recent Form 5500 if 2018 is not available)

| Plan | Partici-pants | Assets | Total RKA Fee | Total RKA Fee /pp | Record-keeper | Graph Color |
|---|---|---|---|---|---|---|
| Publicis Benefits Connection 401K Plan | 42,316 | $2,547,763,175 | $1,167,408 | $28 | Fidelity | White |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | $3,104,524,321 | $1,298,775 | $27 | Vanguard | White |
| Sutter Health 403(B) Savings Plan | 73,408 | $3,681,162,013 | $1,908,133 | $26 | Fidelity | White |
| Google LLC 401(K) Savings Plan | 82,725 | $11,786,824,293 | $1,676,414 | $20 | Vanguard | White |
| Raytheon Savings and Investment Plan | 82,788 | $17,243,679,305 | $2,292,583 | $28 | Fidelity | White |
| **U.S. Bank Plan Average Fee** | **87,317** | **$7,556,201,856** | **$3,596,421** | **$41** | **Alight** | **Red** |
| Marriott International, Inc. Employees' Profit Sharing Retirement and Savings Plan and Trust | 115,501 | $7,660,619,525 | $2,636,322 | $23 | Alight | White |
| Apple 401(K) Plan | 115,686 | $7,400,046,748 | $2,114,871 | $18 | Great-West | White |
| Lowes 401(K) Plan | 154,402 | $5,619,838,861 | $2,856,437 | $19 | Wells Fargo | White |

117.    The comparator Plans serviced by Alight or other recordkeepers charged much less and received the same level and quality of services, as Fidelity pointed out in the *Moitoso* case.

118.    The comparator Plans serviced by other recordkeepers and who charged less received materially the same level and quality of RKA services. Each of these Plans note in their fee disclosures that they received general administrative services just like the U.S. Bank Plan in the form of "recordkeeping, legal, accounting, trustee, and other administrative fees."



119.    The trend line (dashed white in the graph above) generated from these data points represent a reasonable estimate of the fee rate that several recordkeepers, including Alight itself, serving the mega market would be willing to accept in a competitive environment to provide Total RKA services to the Plan.

120.    From the years 2016 through 2021 and based upon information derived from 404(a)(5) participant fee disclosure documents provided to participants in similarly sized plans as well as publicly available information reported on 5500 forms and the accompanying financial statements, as compared to other Plans of similar sizes receiving a materially identical level and quality of Total RKA services, had Defendants been acting prudently, the Plan actually would have paid significantly less than an average of approximately $3,596,421 per year in Total RK&A fees, which equated to an effective average of approximately $41 per participant per year.

121.    From the years 2016 through 2021 and based upon information derived from the 404(a)(5) participant fee disclosure documents provided to participants in similarly sized

plans as well as publicly available information reported on 5500 forms and the accompanying financial statements, as compared to other Plans of similar sizes receiving a materially identical level and quality of Total RKA services, had Defendants been acting prudently, the Plan actually would have paid on average a reasonable effective annual market rate for Total RKA of approximately $2,008,291 per year, which equates to approximately $23 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay *almost twice as much* what they could otherwise pay for the materially identical level and quality of Total RKA services.

122. From the years 2016 through 2021 and based upon information derived from 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements which was equally or even more easily available to Defendants during the Class Period, the Plan additionally cost its participants on average approximately $1,588,130 per year in unreasonable and excessive Total RKA fees, which equates to, on average, approximately $18 per participant per year.

123. From the years 2016 to 2021, and because Defendants did not act with prudence, and as compared to other plans of similar sizes and with a materially identical level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $9,528,778 in unreasonable and excessive Total RK&A fees.

124. From the years 2016 to 2021, based upon information derived from 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements, because Defendants did not act prudently, and as compared to other Plans of similar sizes and with a materially identical level and quality of

services, the Plan caused Plan participants to suffer losses (when accounting for compounding percentages/lost market investment opportunity) a total cumulative amount in excess of $16,637,115 in Total RKA fees.

125.    Defendants could have received RKA services during the Class Period of the same level and quality from Alight or other recordkeepers that provide RKA services to mega plans, like the U.S. Bank plan, because both the Plan 5500 forms and Plan fee disclosures establish that the Plan received no services that were materially different than the services received by all the comparable plans in the chart above. There is no evidence, based on these Plan documents, that the plan received any additional services.

126.    Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, no reasonable tradeoffs existed here because recordkeepers for mega plans, like the one here, are providing the exact same level and quality of services.

127.    Defendants failed to take advantage of the Plan's extremely large size to timely negotiate lower fees from its existing recordkeeper, Alight, and Defendants could have obtained the same Total RKA services for less from other, similar recordkeepers or from Alight itself.

128.    Plaintiff paid these excessive Total RKA fees in the form of direct and indirect compensation to the Plan and suffered injuries to her Plan account as a result.

129.    Plaintiff has participated in several 401(k) plans from other employers and there have been no material differences in the services that she has received.

130.     Plaintiff does not need to provide examples of similar plans receiving the <u>same</u> services in the <u>same</u> year where the primary drivers of price in large plans are the number of accounts and whether the plan's fiduciaries solicited competitive bids, rather than the marginal cost of recordkeeping for each participant." *See Coyer et al. v. Univar Solutions USA Inc. et al.*, 2022 WL 4534791, at *5 (N.D. Ill. Sept. 28, 2022) (emphasis in original).

131.     "The fact that each of the other similarly-sized plans were receiving <u>at least</u> the same services for less provides the kind of circumstantial evidence sufficient to create an inference of imprudence." *Id.* (citing *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 332 (3d Cir. 2019)) (emphasis in original).

132.     During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the Total RKA fees it paid to Alight vis-à-vis the fees that other RKA providers would charge, and would have accepted, for the same level and quality of services.

133.     During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's Total RKA fees it paid to Alight, but Defendants either simply failed to do so, or did so ineffectively, given that it paid *almost two times* the Total RKA fees than it should have.

134.     During the entirety of the Class Period, and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the Total RKA fees it paid to Alight, it would have realized that the Plan was compensating Alight unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and Plan participants, and therefore should have removed Alight as Plan recordkeeper.

135.    The Plan RKA fees were also excessive relative to the recordkeeping services received, since the quality and level of such services are standard for mega 401(k) and 403(b) plans like this Plan and are provided on an "all-you-can-eat-basis," based primarily on the number of participants a plan has. Any difference in RKA fees between comparable Plans is not explained by the level and quality of services each recordkeeper provides.

136.    The market for RKA services for mega plans, like the U.S. Bank Plan, is such that all national recordkeepers can provide all the required services that a mega plan might need. Any differences in the quality or scope of the services delivered are immaterial to the difference between what the Plan paid for RKA services and what he reasonable fair market fee was for identical services.

137.    During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher RKA fees than they should have been and/or by failing to take effective remedial actions including removing Alight as the Plan recordkeeper, Defendants breached their fiduciary duty of prudence to Plaintiffs and Plan participants, causing tens of millions of dollars of harm to Plaintiffs and Class Member's retirement accounts.

## THE PLAN'S FIDUCIARIES DID NOT EFFECTIVELY MONITOR MANAGED ACCOUNT SERVICE FEES AND, AS A RESULT, THE PLAN PAID UNREASONABLE MANAGED ACCOUNT SERVICE FEES

138.    Defendants retained Alight's wholly-owned subsidiary, Alight Financial Advisors (AFA), to provide a managed account service, Professional Management, through which it charged Plan participants a "managed advice fee."  Plaintiff Wesaw participated in this Professional Management service during the Class Period.

139.    The April 28, 2022 U.S. Bank 401(k) Savings Plan Annual Fee Disclosure Notice confirms that AFA provided the *exact same level and quality of services* as all other

managed account service providers of mega 401(k) plans when it states that "[t]he Plan has selected Alight Financial Advisors (AFA), a federally registered independent advisor, to provide fiduciary investment services to Plan participants. AFA offers an online advice tool that can help you fine-tune your investment strategy. The Professional Management program offers personalized portfolio management from professional investment advisors."

140.    In other words, there is little to no material customization provided to the vast majority of plan participants which results in no material value to most participants relative to the fees paid for these Professional Management services.

141.    This is because managed account service providers "generally offer the same basic service—initial and ongoing investment management of a 401(k)-plan participant's account based on generally accepted industry methods."  GAO, *supra*.

142.    For this basic, standardized service, the April 28, 2022 U.S. Bank 401(k) Savings Plan Annual Fee Disclosure Notice indicates that Defendants caused the U.S. Bank Plan participants to pay excessive fees for managed account services in the following amounts: the first $100,000, .60%, the next $150,000, .45%, and more than $250,000, .30%.

143.    The table below illustrates the fee rates paid by similarly situated plans for materially identical managed account services:

| Managed Account Service Fee Rates of Similarly-Situated Plans | Fee on 1st Tier | Fee on 2nd Tier | Fee on 3rd Tier |
|---|---|---|---|
| U.S. Bank "Professional Management fees" | 0.60% | 0.45% | 0.30% |
| Verso Retirement Savings Plan for Bargained Employees (2021) | 0.25% | N/A | N/A |
| AGFA Healthcare Corp. Employee Savings Plan (2018) | 0.40% | 0.30% | 0.20% |
| Caterpillar Sponsored 401(k) Plans (2016) | 0.40% | 0.30% | 0.20% |
| Citi Ret. Savings Plan (2015) | 0.35% | 0.30% | 0.25% |
| JC Penney 401(k) Savings Plan (2015) | 0.35% | 0.25% | 0.10% |
| Comcast Corp. Ret. Investment Plan (2019) | 0.00% | 0.30% | 0.20% |

144.   As illustrated above, in all cases, the participants in the other comparator plans, receiving the same material managed account services, are paying fee rates at every tier significantly lesser than Plan participants.

145.   All the comparator Plans provide the exact same managed account services in the form of asset allocation based on the risk tolerance of the investor, with little to no individual customization.

146.   A number of other managed account providers also exist whose services are virtually identical to the services provided to Plan participants through the "Professional Management" service and whose fees approximate 0.25% on all assets, e.g., Betterment, Vanguard, and Charles Schwab, for plans much smaller and with less bargaining leverage than the U.S. Bank Plan.

147.   The fee rates paid by the Plan participants to AFA, including by Plaintiff

Wesaw, for the Professional Management services was excessive and objectively un-reasonable given the Plan's size and negotiating power.

148.    Defendants could have offered the exact same managed account services at a lower cost by using a different managed account provider or by utilizing a target date fund but did not do so.

149.    Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, these managed account allegations are not about reasonable tradeoffs between managed account service providers offering a different level or quality of services.

150.    Rather, Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing managed account service providers or Defendants could have obtained the materially same managed account services for less through another provider if it had solicited competitive bids for the same services.

151.    The asset allocations created by AFA were also not materially different than the asset allocation of the age appropriate target date option made available to the Plan's participants at a much lower fee.

152.    As the GAO recognized in its reports on managed accounts, "Similar advantages … can be achieved through other retirement investment vehicles outside of a managed account and without paying the additional managed account fee. For example, in one recent study, a record keeper that offers managed accounts through its

platform showed that there are other ways to diversify using professionally managed allocations, such as target date funds, which can be less costly." THE UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE ("GAO"), *401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts*, at 32 (June 2014), available at https://www.gao.gov/assets/670/664391.pdf.

153.   As a result, based on the value provided, the reasonable fee for the Managed Advice service was zero or very close to zero, and the use of the managed account services provided by AFA cost the Plan tens of millions of dollars of wasted managed account service provider fees:

| Hewitt/Alight Financial Advisors Excess Compensation over 0bps | | | | | | | |
|---|---|---|---|---|---|---|---|
| Provider | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
| Hewitt/Alight Financial Advisors | $1,352,158 | $1,709,463 | $2,019,202 | $2,430,253 | $3,012,726 | $3,573,069 | $14,096,871 |
| Compounding Percentage (VIIIX) | 11.95% | 21.82% | -4.41% | 31.48% | 18.41% | 28.69% | |
| Estimated Cumulative Losses | $1,352,158 | $3,356,662 | $5,227,835 | $9,303,811 | $14,029,368 | $21,627,463 | |

154.   Even if one compares the managed account services provided by AFA to the U.S. Bank Plan to materially identically managed account services provided by Betterment, Schwab, or Vanguard, which charged a fee of 0.25% or 25 bps, Defendants still cost Plan participants in the managed account services tens of millions of dollars in lost retirement savings:

| Hewitt/Alight Financial Advisors - Excess Compensation over 25bps | | | | | | | |
|---|---|---|---|---|---|---|---|
| Provider | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
| Hewitt/Alight Financial Advisors | $1,352,158 | $1,709,463 | $2,019,202 | $2,430,253 | $3,012,726 | $3,573,069 | $14,096,871 |
| | | | | | | | |
| Estimated Assets @ .60% | $225,359,667 | $284,910,500 | $336,533,667 | $405,042,167 | $502,121,000 | $595,511,500 | |
| Estimated Compensation at .25% | $563,399 | $712,276 | $841,334 | $1,012,605 | $1,255,303 | $1,488,779 | |
| | | | | | | | |
| Excess Compensation | $788,759 | $997,187 | $1,177,868 | $1,417,648 | $1,757,424 | $2,084,290 | |
| Compounding Percentage (VIIIX) | 11.95% | 21.82% | -4.41% | 31.48% | 18.41% | 28.69% | |
| Estimated Cumulative Losses | $788,759 | $1,958,053 | $3,049,570 | $5,427,223 | $8,183,798 | $12,616,020 | |

155.   A prudent fiduciary would have conducted periodic competitive solicitations (including issuing an RFP, if necessary), as well as evaluating the incremental value provided to Plan participants, to ensure that the amounts paid by the Plan for managed account services were reasonable. Had Defendants done so, Plaintiff Wesaw and other Plan participants would not have paid the excessive managed account service fees that they did.

156.   Based on the excessive amounts paid by the Plan for managed account services, it is reasonable to infer that Defendants failed to prudently monitor and manage the Plan's managed account services.

157.   Defendants' failure to properly monitor or control fees for the Plan's managed account service provided by AFA cost resulted in participating Plan participants paying excessive and objectively unreasonable fees, constitutes a separate and independent breach of the fiduciary duty of prudence, and cost Plaintiff Wesaw and other Plan participants who used the services tens of millions of dollars of harm to their retirement accounts.

## CLASS ACTION ALLEGATIONS

158.   29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

159.   In acting in this representative capacity, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representative of, the following Class:

> All participants and beneficiaries of the U.S. Bank 401(k) Savings Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning January 5, 2017, and running through the date of judgment.

160.    The Class includes approximately 87,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

161.    There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

>  a.    Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

>  b.    Whether Defendants breached their fiduciary duties to the Plan;

>  c.    What are the losses to the Plan resulting from each breach of fiduciary duty; and

>  d.    What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of fiduciary duty.

162.    Plaintiffs' claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were participants during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

163.    Plaintiffs will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they were participants in the Plan during the

Class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

164.   Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

165.   Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

166.   Plaintiffs' attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the Class.

167.   The claims brought by the Plaintiffs arise from fiduciary breaches as to the Plan in its entirety and does not involve mismanagement of individual accounts.

168.   The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in the individual participants' Plan. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

169.   Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

170.   Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

### FIRST CLAIM FOR RELIEF
### Breach of Duty of Prudence of ERISA, as Amended
### (Plaintiffs, on behalf of themselves and Class, Against Defendants
### Plan Committees – RKA Fees)

171.   Plaintiffs restate the above allegations as if fully set forth herein.

172.   Defendant Plan Committees are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

173.   29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendant Plan Committees in their administration of the Plan.

174.    Defendant Plan Committees, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges objectively reasonable RKA fees.

175.    During the Class Period, Defendant Plan Committees had a fiduciary duty to do all of the following: ensure that the Plan's RKA fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

176.    During the Class Period, Defendant Plan Committees breached their fiduciary duty of prudence to Plan participants, including to Plaintiffs, by failing to: ensure that the Plan's RKA fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

177.    During the Class Period, Defendant Plan Committees further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper, Alight, to make sure it was providing the RKA services at reasonable costs, given the highly competitive market surrounding recordkeeping and the significant bargaining power the Plan had to negotiate the best fees, and remove the recordkeeper if it provided recordkeeping services at objectively unreasonable levels.

178.    During the Class Period, Defendant Plan Committees breached their duty to Plan participants, including to Plaintiffs, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeeper critically or objectively in comparison to other recordkeeper options.

179.   Defendant Plan Committees' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

180.   As a result of Defendant Plan Committees' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered tens of millions of dollars in objectively unreasonable and unnecessary monetary losses.

181.   Defendant Plan Committees are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the U.S. Bank Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendant Plan Committees are subject to other equitable relief as set forth in the Prayer for Relief.

## SECOND CLAIM FOR RELIEF
### Breaches of Duty of Prudence of ERISA, as Amended
### (Plaintiff Wesaw, on behalf himself and Class, Against
### Defendants Plan Committees – Managed Account Service Fees)

182.   Plaintiff Wesaw restates the above allegations as if fully set forth herein.

183.   Defendants Plan Committees are fiduciaries of the Plan under 29 U.S.C. §§1002(21) and/or 1102(a)(1).

184.   29 U.S.C. §1104(a)(1)(B) imposes fiduciary duties of prudence upon Defendants Plan Committees in their administration of the Plan. Defendants Plan Committees, as fiduciaries of the Plan, are responsible for selecting a managed account service provider that charges reasonable managed account service fees.

185.   During the Class Period, Defendants Plan Committees had a fiduciary duty to do all of the following: ensure that the Plan's managed account service fees were reasonable; manage the assets of the Plan prudently; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

186.   During the Class Period, among other things, Defendants Plan Committees imprudently caused the Plan to pay excessive managed account service fees and failed to properly monitor and control those expenses.

187.   During the Class Period, Defendants Plan Committees further had a continuing duty to regularly monitor and evaluate the Plan's managed account provider, AFA, to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding managed account services and the significant bargaining power the Plan had to negotiate the best fees.

188.   During the Class Period, Defendants Plan Committees breached their duty to Plan participants by failing to employ a prudent process by failing to evaluate the cost of the Plan's managed account provider critically or objectively in comparison to other managed account options, or in comparison to less costly target-date funds.

189.    Defendants Plan Committees' failure to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. §1104(a)(1)(B).

190.    As a result of Defendants Plan Committees' breach of fiduciary duty of prudence with respect to the Plan and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

191.    Defendants Plan Committees are liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants Plan Committees are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2).

### THIRD CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
(Plaintiffs, on behalf of themselves and Class, Against Defendants
U.S. Bank and Board – RKA Fees)**

192.    Plaintiffs restate the above allegations as if fully set forth herein.

193.    Defendants U.S. Bank and Board had the authority to appoint and remove members or individuals responsible for Plan RKA fees on the Plan Committees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

194.   In light of this authority, Defendants U.S. Bank and Board had a duty to monitor those individuals responsible for Plan RKA fees on the Plan Committees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

195.   Defendants U.S. Bank and Board had a duty to ensure that the individuals responsible for Plan RKA fees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's RKA fees; and reported regularly to Defendant U.S. Bank and Board.

196.   The objectively unreasonable and excessive RKA fees paid by the Plan inferentially establish that Defendants U.S. Bank and Board breached their duty to monitor by, among other things:

   a.   Failing to monitor and evaluate the performance of individuals responsible for Plan RKA fees on the Plan Committees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably RKA expenses;

   b.   Failing to monitor the process by which the Plan's recordkeeper, Alight, was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

   c.   Failing to remove individuals responsible for Plan RKA fees on the Plan Committees whose performance was inadequate in that these individuals continued to pay the same RKA costs even though solicitation of competitive bids would have

shown that maintaining Alight as the recordkeeper at the con-
tracted price was imprudent, excessively costly, all to the detri-
ment of the Plaintiffs' and other Plan participants' retirement
savings.

197.   As the consequences of the breaches of the duty to monitor for RKA fees
the Plaintiffs and Plan participants suffered tens of millions of dollars of objectively
unreasonable and unnecessary monetary losses.

198.   Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants U.S. Bank
and Board are liable to restore to the U.S. Bank Plan all losses caused by their failure
to adequately monitor individuals responsible for Plan RKA fees on the Plan Com-
mittees. In addition, Plaintiffs are entitled to equitable relief and other appropriate
relief as set forth in the Prayer for Relief.

## FOURTH CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
(Plaintiff Wesaw, on behalf of himself and Class, Against Defendants
U.S. Bank and Board – Managed Account Service Fees)

199.   Plaintiff Wesaw restates the above allegations as if fully set forth herein.

200.   Defendants U.S. Bank and Board had the authority to appoint and re-
move members or individuals responsible for Plan managed account fees on the Plan
Committees and knew or should have known that these fiduciaries had critical re-
sponsibilities for the Plan.

201.   In light of this authority, Defendants U.S. Bank and Board had a duty
to monitor those individuals responsible for Plan managed account fees on the Plan

Committees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

202.   Defendants U.S. Bank and Board had a duty to ensure that the individuals responsible for Plan managed account fees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's managed account fees; and reported regularly to Defendant U.S. Bank and Board.

203.   The objectively unreasonable and excessive managed account fees paid by the Plan inferentially establish that Defendants U.S. Bank and Board breached their duty to monitor by, among other things:

> a.   Failing to monitor and evaluate the performance of individuals responsible for Plan managed account fees on the Plan Committees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably managed account expenses;

> b.   Failing to monitor the process by which the Plan's managed account service provider, AFA, was evaluated and failing to investigate the availability of more reasonably-priced managed account service providers; and

> c.   Failing to remove individuals responsible for Plan managed account fees on the Plan Committees whose performance was inadequate in that these individuals continued to pay the same managed account costs even though solicitation of competitive bids would have shown that maintaining AFA as the

managed account service provider at the contracted price was im-
prudent, excessively costly, all to the detriment of the Plaintiffs'
and other Plan participants' retirement savings.

204.    As the consequences of the breaches of the duty to monitor for managed
account fees the Plaintiffs and Plan participants suffered tens of millions of dollars of
objectively unreasonable and unnecessary monetary losses.

205.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants U.S. Bank
and Board are liable to restore to the U.S. Bank Plan all losses caused by their failure
to adequately monitor individuals responsible for Plan managed account fees on the
Plan Committees. In addition, Plaintiffs are entitled to equitable relief and other ap-
propriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiffs pray that judgment be entered against De-
fendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under
Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of
Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of
Plaintiffs' counsel as Class Counsel;

C.    A Declaration the Defendants have breached their fiduciary duties un-
der ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses
to the Plan resulting from Defendants' breaches of fiduciary duty, in-
cluding restoring to the Plan all losses resulting from paying unreason-
able RKA and managed account fees, and restoring to the Plan all profits
the Defendants made through use of the Plan's assets, and restoring to
the Plan all profits which the Participants would have made if the De-
fendants had fulfilled their fiduciary obligations;

E.    An Order requiring U.S. Bank to disgorge all profits received from, or in
respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. §

1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against U.S. Bank as necessary to effectuate relief, and to prevent U.S. Bank's unjust enrichment;

F.      An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary/consultant or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.      An award of pre-judgment interest;

I.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      Such other and further relief as the Court deems equitable and just.

Respectfully submitted,

Date: January 5, 2023          MILLER & STEVENS, P.A.

By: s/ Amy R. Mason
Amy R. Mason, Esq. (#0347760)
92 Lake Street  S.
Forest Lake, MN 55025
Telephone: (651) 462-0206
amy@millerstevens.com

Paul M. Secunda
(*pro hac vice motion pending*)
WALCHESKE & LUZI, LLC
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (414) 828-2372

*Attorneys for Plaintiffs and Proposed Class*