## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| ANA L. DIONICIO and ALEJANDRO M. WESAW, individually, and as a representative of a Class of Participants and Beneficiaries of the U.S. Bank 401(k) Savings Plan,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. Bancorp, the Board of Directors of U.S. Bancorp, and U.S. Bancorp's Benefits Administration Committee and U.S. Bancorp's Investment Committee,<br><br>Defendants. | Case No. 0:23-cv-00026-PJS-JFD |

## MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANTS' MOTION TO DISMISS

Melissa D. Hill (pro hac vice)
Christopher Diffee (pro hac vice)
William Engelhart (pro hac vice)
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178
212-309-6000
212-309-6001 (fax)
melissa.hill@morganlewis.com
christopher.diffee@morganlewis.com
william.engelhart@morganlewis.com

Daniel J. Supalla (#0387064)
Maria S. Agostinho Campbell (#0401778)
Nilan Johnson Lewis PA
250 Marquette Avenue South, Suite 800
Minneapolis, MN 55401
612-305-7500
612-305-7501 (fax)
dsupalla@nilanjohnson.com
MACampbell@nilanjohnson.com

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     RELEVANT FACTUAL BACKGROUND........................................................ 4

        A.      The U.S. Bank 401(k) Savings Plan ........................................................ 4

III.    ARGUMENT ...................................................................................................... 7

        A.      Applicable Legal Standards. .................................................................... 7

        B.      The Eighth Circuit Requires Plaintiffs to Allege "Meaningful
                Benchmarks" to State a Claim for Imprudence Based on Excessive Plan
                Fees. ......................................................................................................... 8

        C.      Plaintiffs' Recordkeeping Fee Allegations Fail Because Plaintiffs Do Not
                Allege a "Meaningful Benchmark." ...................................................... 10

                1.      Plaintiffs' Fee Comparison Does Not Account for the U.S. Bank
                        Recordkeeping Fees for the Actual Period Being Compared. ................ 12

                2.      Plaintiffs Fail to Allege the Actual Services Provided to the U.S.
                        Bank Plan or to the Comparator Plans..................................... 12

                3.      Plaintiffs Fail to Allege Which Fees Are Included in Their
                        Asserted Fee Comparison. ........................................................ 15

                4.      Plaintiffs' Comparator Plans Are Not "Similarly Sized" to the U.S.
                        Bank Plan, as *Matousek* Requires............................................. 17

        D.      Plaintiffs' Managed Account Fee Allegations Fail to State a Claim. .................. 20

        E.      Plaintiffs Fail to State a Plausible Claim for Failure-to-Monitor Other Plan
                Fiduciaries............................................................................................... 27

IV.     CONCLUSION.................................................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albert v. Oshkosh*,
  47 F.4th 570 (7th Cir. 2022) ...................................................................9, 14, 20, 27

*Anderson v. Coca-Cola Bottlers' Ass'n*,
  No. 21-2054, 2022 WL 951218 (D. Kan. Mar. 30, 2022) .......................................16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................................7

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 555 (2008)..........................................................................................20

*Cunningham v. USI Ins. Servs., LLC*,
  No. 21 Civ. 1819, 2022 WL 889164 (S.D.N.Y. Mar. 25, 2022) .............................16

*Davis v. Wash. Univ. in St. Louis*,
  960 F.3d 478 (8th Cir. 2020) ........................................................................5, 7, 9, 12

*Fifth Third Bancorp v. Dudenhoeffer*,
  573 U.S. 409 (2014)....................................................................................2, 4, 8, 24

*Forman v. TriHealth*,
  40 F.4th 443 (6th Cir. 2022) ...................................................................................14

*Fritton v. Taylor*,
  No. 22-cv-00415, 2022 WL 17584416 (D. Minn. Dec. 12, 2022) ..........................16

*Glick v. ThedaCare*,
  No. 20-CV-1236, 2022 WL 16927749 (E.D. Wisc. Oct. 27, 2022) ..................23, 25

*Gonzalez v. Northwell Health, Inc.*,
  No. 20-CV-3256 (RPK) (RLM), 2022 WL 4639673 (E.D.N.Y. Sept. 30, 2022)....16

*Guyes v. Nestle USA*,
  No. 20-CV-1560, 2022 WL 18106384 (W.D. Wisc. Nov. 21, 2022)......................11

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009) .....................................................................................6

*U.S. ex rel. Kraxberger v. Kan. City Power & Light Co.*,
   756 F.3d 1075 (8th Cir. 2014) ................................................................................................5

*Krutchen v. Ricoh USA, Inc.*,
   No. 22-cv-678, 2022 WL 16950264 (E.D. Pa. Nov. 15, 2022) ..............................................15

*Laabs v. Faith Techs., Inc.*,
   No. 20-CV-1534, 2022 WL 17418358 (E.D. Wis. Nov. 9, 2022) .....................................14, 23

*Loomis v. Exelon Corp.*,
   658 F.3d 667 (7th Cir. 2011) ................................................................................................21

*Mator v. Wesco Distrib., Inc.*,
   No. 21-CV-00403, 2022 WL 3566108 (W.D. Pa. Aug. 18, 2022) ...................................14, 20

*Matousek v. Mid-American Energy Company,*
   51 F.4th 274 (8th Cir. 2022) ......................................................................................... *passim*

*Meiners v. Wells Fargo & Co.*,
   898 F.3d 820 (8th Cir. 2018) ........................................................................................ *passim*

*PBGC v. Morgan Stanley Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013)....................................................................................................8

*Probst v. Eli Lilly*,
   No. 22-cv-01106, 2023 WL 1782611 (S.D. Ind. Feb. 3, 2023) ........................................14, 19

*Riley v. Olin Corp.*,
   No. 21-CV-01328, 2022 WL 2208953 (E.D. Mo. June 21, 2022) ..........................................20

*Riley v. Olin Corp.*,
   No. 4:21-cv-01328-SRC, 2023 WL 371872 (E.D. Mo. Jan. 24, 2023) ...................................15

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
   No. 3:15-cv-1839, 2016 WL 7494320 (D. Conn. Dec. 30, 2016) ...........................................21

*Schulte v. Conopco, Inc.*,
   997 F.3d 823 (8th Cir. 2021) .......................................................................................7, 13, 20

*Sigetich v. The Kroger Co.*,
   No. 1:21-cv-697, 2023 WL 2431667 (S.D. Ohio Mar. 9, 2023) .........................................3, 19

*Singh v. Deloitte LLP*,
   No. 21-CV-8458, 2023 WL 186679 (S.D.N.Y. Jan. 13, 2023) ...............................................14

*Smith v. CommonSpirit Health*,
   37 F. 4th 1160 (6th Cir. 2022) ......................................................................................9, 14, 19

*White v. Chevron Corp.*,
   No. 16-cv-793, 2016 WL 4502808  (N.D. Cal. Aug. 29, 2016)...............................................20

## I.     **INTRODUCTION**

Plaintiffs, two former participants in the U.S. Bank 401(k) Savings Plan (the "U.S. Bank Plan" or "Plan"), allege that U.S. Bancorp, the Board of Directors of U.S. Bancorp, U.S. Bancorp's Benefits Administration Committee, and U.S. Bancorp's Investment Committee (together, "Defendants") breached their fiduciary duties under the Employee Retirement Income Security Act ("ERISA") by failing to monitor and control the Plan's recordkeeping and managed account service fees from 2017 to the present.  ECF No. 1 ("Compl.") ¶¶ 111-57.

But, like countless excessive fee complaints, Plaintiffs' Complaint is largely "cookie cutter," composed of vague and generalized allegations and lacking specific facts about the U.S. Bank Plan.  Plaintiffs fail to state a claim because they do not offer any meaningful benchmark from which to conclude the Plan's fees were "excessive," thus precluding any plausible inference that Plan fiduciaries acted imprudently under ERISA. To state a viable claim for breach of ERISA's duty of prudence based on allegedly excessive fees, a plaintiff must do more than simply claim that fees could have been lower.  Rather, the Eighth Circuit requires a plaintiff to "provide a sound basis for comparison—a meaningful benchmark" to support a plausible claim that fees were excessive and so create an inference of possible imprudence.  *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018).  The Eighth Circuit recently affirmed dismissal of nearly identical recordkeeping claims in *Matousek v. Mid-American Energy Company*, finding that none of the plaintiffs' benchmarks provided a "like-for-like comparison" that

"similarly sized plans spend less on the same services."  51 F.4th 274, 279-80 (8th Cir. 2022).

*Matousek* mandates dismissal of Plaintiffs' claims here.  As to their recordkeeping claims, Plaintiffs' only attempt to provide a "meaningful benchmark" comes in the form of a chart supposedly comparing the Plan's recordkeeping fees with the fees allegedly paid by eight other retirement plans.  Compl. ¶ 116.  Yet that fee comparison is deficient in several respects.  ***First***, Plaintiffs fail to provide any plausible factual allegations regarding the actual services provided by the Plan's recordkeeper or the eight other recordkeepers in the comparison.  So it is impossible to know whether Plaintiffs are offering an "apples-to-apples" comparison of the fees paid for "the *same services*," as *Matousek* requires.  51 F.4th at 279 (emphasis added).  ***Second***, the Complaint lacks any information about which fees are included and excluded from Plaintiffs' comparison—if, for instance, it reflects fees for both recordkeeping and non-recordkeeping services, fees from both direct and indirect sources, and fees for plan-wide services (paid by all) and elective Plan services (paid only by the individuals using those services).  Lacking this necessary context, there can be no meaningful comparison of fees.  ***Third***, *Matousek* requires Plaintiffs to compare the Plan's fees against the fees of "similarly sized plans" with similar numbers of participants and amounts of plan assets.  51 F.4th at 279.  But all of Plaintiffs' comparator plans are materially different from the U.S. Bank Plan—some comparators have *less than half* the participants, while others have more than *twice* the assets.  For these reasons, Plaintiffs' purported recordkeeping fee comparison—involving dissimilar plans with no plausible factual description of the services and fees being

compared—fails to provide the "meaningful comparison" *Matousek* deems necessary to create an inference of fiduciary imprudence. *Id.*

Indeed, just last week, the Southern District of Ohio rejected recordkeeping claims based on a ***nearly verbatim*** comparison chart offered by the same plaintiffs' counsel as here. *See Sigetich v. The Kroger Co.*, No. 1:21-cv-697, 2023 WL 2431667 (S.D. Ohio Mar. 9, 2023). Specifically, the court analyzed the proffered comparator plans—each of which is proffered by Plaintiffs here, too—and concluded (a) "wholly conclusory" allegations about services provided to all plans, absent further context, are insufficient, *id.* at *9; (b) the Form 5500s for the comparator plans confirmed material differences in services offered across the plans, *id.*; and (c) the "comparable" plans were not comparable in any event due to significant differences in size, *id.* at *10. The same result is warranted here.

Plaintiffs' claims regarding the Plan's managed account service fees suffer the same fatal defects. Plaintiffs' only attempt to provide a plausible factual basis for these claims is, again, a scantly detailed chart purporting to compare the Plan's managed account service fees with those allegedly charged to six other plans. But, once again, *Matousek* compels dismissal, as Plaintiffs fail to provide any of the required context to show that "similarly sized plans spend less on the same services." 51 F.4th at 279. ***First***, Plaintiffs fail to allege the specific account services provided to each comparator plan, which entity allegedly offers those services, or even the source of Plaintiffs' purported fee information. ***Second***, Plaintiffs' chart purports to compare fees across three tiers (based on an individual participant's assets under management), but fails to identify the

asset amounts that comprise each tier, making it impossible to compare the asserted fees across plans. **Third**, Plaintiffs fail to allege that the comparator plans are "similarly sized" to the U.S. Bank Plan—and the Form 5500s for those plans show they are vastly different, with one comparator having only *0.9%* the number of participants, while another has over *$2.7 billion more* in plan assets. Plaintiffs' managed account service fee claims fail under *Matousek* and should be dismissed.

Finally, Plaintiffs' derivative claim that certain Defendants failed to monitor other Plan fiduciaries fails along with their primary claims. For these reasons, discussed further below, the Court should dismiss Plaintiffs' Complaint with prejudice in its entirety.

## II.   RELEVANT FACTUAL BACKGROUND

### A.   The U.S. Bank 401(k) Savings Plan

To provide retirement benefits for eligible employees, U.S. Bank sponsors the U.S. Bank Plan, a defined contribution retirement plan that, in 2021, had over 86,000 participants and $9.8 billion in assets. *See* Compl. ¶¶ 33-34. Like many large retirement plans, the Plan relies upon a number of nationally recognized service providers to assist in its administration. In particular, during the putative class period of January 2017 to the present (the "Relevant Period"), Alight Solutions (and its predecessors) ("Alight") provided the Plan with what are known as "recordkeeping" services, which may include—among other things—maintaining account balances and tracking assets in participant accounts, issuing plan documents and participant communications, maintaining call centers, and providing access to a plan-related website and internet

account. *Id.* ¶ 47. In addition, in this period, Alight Financial Advisors ("AFA") offered optional managed account services to Plan participants who elected those services. *Id.* ¶ 6. The Plan also relied upon other third-party entities to provide legal, accounting, trustee, custodial, brokerage, insurance, and investment management services to the Plan and its participants, none of which are at issue in this action.

In the Relevant Period, these service providers were compensated in different ways. First, every participant paid **required plan-wide fees** for services used equally by all participants across the Plan, including the recordkeeping services provided by Alight. From 2017 to 2020, these plan-wide fees were asset-based, meaning that each participant's fees were based on their total account balance. *Id.* ¶ 48. In 2021, this asset-based fee was replaced by a flat monthly fee for the same Plan administrative services. *See* Declaration of Melissa D. Hill, Exhibit 1 at App. 001.[1]

---

[1] All exhibits attached to the Declaration of Melissa D. Hill have been stamped with appendix page numbers, referred hereafter as "App. __." A court considering a Rule 12(b)(6) motion may consider the allegations included in the complaint as well as "matters incorporated by reference or integral to the claim, items subject to judicial notice, and matters of public record." *U.S. ex rel. Kraxberger v. Kan. City Power & Light Co.*, 756 F.3d 1075, 1083 (8th Cir. 2014). Here, Plaintiffs' Complaint directly quotes both from the Plan's 2022 participant fee disclosure (provided pursuit to 29 C.F.R. § 2550.404a-5), *see Compl.* ¶¶ 48, 51, 73, 80, 139, 142, and from the Form 5500s filed with the U.S. Department of Labor, *see id.* ¶¶ 6 n.1, 29, 97, 115 & n.2, 116. Accordingly, such disclosures have been "incorporated by reference" in the Complaint and are "integral to the claim[s]" Plaintiffs assert. *Kraxberger*, 756 F.3d at 1083. The Eighth Circuit regularly considers such disclosures in addressing similar ERISA fiduciary breach claims. *See Matousek*, 51 F.4th at 279 (considering Form 5500s and participant fee disclosures); *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 484 n.3 (8th Cir. 2020) (considering "fund prospectuses and plan disclosure documents"); *Meiners*, 898 F.3d at 823 (considering fund prospectuses because "those matters are necessarily embraced by the pleadings").

Second, in addition to plan-wide fees, ***individual elective fees*** may be paid by those participants who choose to use certain additional services offered on a voluntary basis. For instance, Plan participants may borrow money from their accounts in the form of low-interest loans and pay a one-time fee of $90 for each loan. Compl. ¶¶ 49-51; App. 001. Similarly, the Plan offers participants a self-directed brokerage window that allows them to invest in funds outside the Plan's investment menu for a $20 quarterly maintenance fee and additional transaction fees, depending on account activity. App. 002-003. Particularly relevant here is the Professional Management program, which offers Plan participants "personalized portfolio management from professional investment advisors." Compl. ¶ 139; App. 002. Participants who choose to enroll in this service pay a monthly fee based on the amount of assets being managed—beginning with 0.60% for the first $100,000, then 0.45% for the next $150,000, and 0.30% for all assets over $250,000. Compl. ¶ 142; App. 002.

Third, certain funds offered in the Plan's investment menu pay a designated portion of their stated fee to specific third parties, including the Plan's recordkeeper, to offset the expense of services that would otherwise be incurred by the fund's managers. *See* Compl. ¶ 74. Courts have recognized this practice of ***indirect compensation***, often referred to as "***revenue sharing***," as an acceptable way of structuring overall plan fees. *See Hecker v. Deere & Co.*, 556 F.3d 575, 585 (7th Cir. 2009).

Plaintiffs here do not challenge the amounts participants generally pay in plan fees *per se*; rather, they contend that Plan fiduciaries failed to prudently monitor and control the fees paid (a) to Alight for recordkeeping and related services; and (b) to AFA for

6

managed account services.  They claim this imprudence can be inferred from the fact that the recordkeeping and managed account service fees were allegedly higher than fees paid by a handful of other plans.  The Complaint does not challenge the fees paid to any other Plan service providers or the individual costs of any other Plan-related services.

## III.   ARGUMENT

### A.   Applicable Legal Standards

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Plaintiffs must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.  While the Court must accept well-pled facts as true, it "need not accept as true a plaintiff's conclusory allegations or legal conclusions drawn from the facts." *Schulte v. Conopco, Inc.*, 997 F.3d 823, 825 (8th Cir. 2021).  To state a viable claim for a fiduciary breach under ERISA, Plaintiffs must offer factual allegations plausibly showing retirement plan fiduciaries failed to act "with the care, skill, prudence, and diligence under the circumstances then prevailing" that a prudent person would use.  29 U.S.C. § 1104(a)(1)(B).  This "prudent person" analysis is based on "an objective standard that focuses on the process by which decisions are made, rather than the results of those decisions." *Davis*, 960 F.3d at 482 (citation omitted).  A prudent fiduciary is not required "to scour the market to find and offer the cheapest possible fund" or to ensure that plan participants pay the lowest fees available, but only to undertake a prudent process to monitor and control plan fees and investments. *Id.* at 486.

Where, as here, a complaint lacks direct allegations about the fiduciary's process, a plaintiff must allege enough facts for the court to "*infer . . . that the process was flawed.*" *Id*. at 482–83.

In assessing the plausibility of ERISA fiduciary breach claims under Rule 12(b)(6), courts must undertake a "careful, context-sensitive scrutiny of a complaint's allegations." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). In the ERISA class-action context, a motion to dismiss is an "important mechanism for weeding out meritless claims." *Id*. This is because plan fiduciaries often find themselves "between a rock and a hard place," facing litigation regardless of what decision they make. *Id*. at 424. Compounding that problem, "the prospect of discovery" in ERISA class actions "elevates the possibility that a plaintiff with a largely groundless claim will simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." *PBGC v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013). Accordingly, such complaints require "careful, context-sensitive scrutiny" at the pleading stage. *Dudenhoeffer*, 573 U.S. at 425.

> **B.**     **The Eighth Circuit Requires Plaintiffs to Allege "Meaningful Benchmarks" to State a Claim for Imprudence Based on Excessive Plan Fees.**

"The key to nudging an inference of imprudence from possible to plausible is providing 'a sound basis for comparison—a meaningful benchmark'—not just alleging that 'costs are too high, or returns are too low.'" *Matousek*, 51 F.4th at 278 (quoting *Davis*, 960 F.3d at 484). A "meaningful benchmark" requires a "like-for-like comparison" based on plausible factual allegations that "similarly sized plans spend less

on the same services" as the challenged plan. *Matousek*, 51 F.4th at 279; *see also Meiners*, 898 F.3d at 822. The Eighth Circuit has repeatedly affirmed dismissal of ERISA fiduciary breach claims when plaintiffs, as here, fail to provide that "meaningful benchmark." *See Meiners*, 898 F.3d at 822; *Davis*, 960 F.3d at 484-85 (affirming dismissal of fiduciary breach claim because complaint compared funds with "different aims, different risk, and different potential rewards that cater to different investors," thus failing to offer "meaningful benchmark" required by *Meiners*). *See also Albert v. Oshkosh*, 47 F.4th 570, 579 (7th Cir. 2022) (affirming dismissal of recordkeeping claims brought by *Plaintiffs' same counsel* where complaint was "devoid of allegations as to the quality or type of recordkeeping services the comparator plans provided," holding plaintiff "cannot proceed to discovery solely on the basis that the Plan paid higher recordkeeping fees than a potentially random assortment of nine other plans from around the country"); *Smith v. CommonSpirit Health*, 37 F. 4th 1160, 1169 (6th Cir. 2022) (affirming dismissal of recordkeeping claims because plaintiffs failed to plead "that the services that CommonSpirit's fee covers are equivalent to those provided" by the alleged comparator plans).

The Eighth Circuit recently reiterated *Meiners*' requirement of a "meaningful benchmark" in *Matousek*, 51 F.4th at 278, where the court affirmed dismissal of materially indistinguishable ERISA excessive recordkeeping fee claims because plaintiffs failed to establish a "meaningful benchmark" by which the court could infer plan fiduciaries acted imprudently. The Eighth Circuit's analysis in *Matousek* controls the instant case and similarly requires dismissal of Plaintiffs' claims. First, *Matousek*

explained that, while plaintiffs alleged the plan paid its recordkeeper, Merrill Lynch, an "unreasonable" amount "between $326 and $526 per plan participant," the complaint failed to describe the specific services Merrill Lynch provided and whether "similarly sized plans spend less on the same services." *Id*. at 279.  Taking judicial notice of the plan's Form 5500 and participant fee disclosures, the court noted that Merrill Lynch's fees were not simply for recordkeeping services, but included payments for "non-recordkeeper services," including fees for "loan-origination" and "self-directed brokerage accounts." *Id*.  The court further noted the fees paid to Merrill Lynch—which took the form of both direct participant payments and indirect revenue-sharing payments—included both plan-wide fees paid by all participants and individual fees "charged against the account of individual participants rather than [paid] on a plan-wide basis." *Id*.  As to plaintiffs' so-called "comparators," the court found each failed to provide the "meaningful benchmark" the Eighth Circuit required in *Meiners* because the comparators reflected fees for different services than those offered by Merrill Lynch, omitted fees charged for "individualized services," and otherwise reflected fees paid by "smaller plans" with far fewer participants.  *Id*. at 280.  As the court concluded: "[W]ithout a meaningful benchmark, the plaintiffs have not created a plausible inference that the decision-making process itself was flawed." *Id*.

    **C.**    <u>**Plaintiffs' Recordkeeping Fee Allegations Fail Because Plaintiffs Do Not Allege a "Meaningful Benchmark."**</u>

Under the Eighth Circuit's controlling precedent in *Matousek*, Plaintiffs must plausibly allege that "similar sized plans spend less on the same services"—i.e., provide a

"meaningful benchmark." 51 F.4th at 279. They have not done so. Instead, Plaintiffs present a chart that purports to show, based on data from the Form 5500s for eight other retirement plans, that in 2018 these eight plans paid their own recordkeepers between $18 and $28 per participant, whereas for a *different period* (2016 to 2021), U.S. Bank allegedly paid Alight an "average fee" of $41 per participant. *See* Compl. ¶¶ 115-19. This is, at best, a "naked fee-to-fee comparison,"[2] based on data from undisclosed sources,[3] that fails to provide any sort of meaningful context in which to understand the fees or services being compared. In particular, Plaintiffs fail to provide the context required by *Matousek* because their Complaint (1) does not account for the Plan's recordkeeping fees for the period being compared; (2) lacks plausible factual allegations regarding the actual services provided to either the Plan or the comparator plans; (3) fails to allege which fees are even being included in its asserted fee comparison; and (4) offers comparator plans with significantly different numbers of participants and amounts of plan assets from the U.S. Bank Plan. For these reasons, described further below, the

---

[2] *See Guyes v. Nestle USA*, No. 20-CV-1560, 2022 WL 18106384, at *4 (W.D. Wisc. Nov. 21, 2022) (dismissing recordkeeping claims based on "only a naked fee-to-fee comparison" that failed to identify the "specific services performed by the comparator plans' recordkeepers").

[3] Plaintiffs' fee chart purports to compute the "per-participant fee" for each plan by dividing the total number of plan participants by the "Total RKA [recordkeeping and administrative] fee" for each plan "based on publicly available information from Form 5500." Compl. ¶ 116 (chart title). But for almost none of Plaintiffs' comparator plans does the "Total RKA fee" in the chart actually match the recordkeeping fees reflected in the plans' Form 5500s. Accordingly, the actual source and method of computing these fees is not provided by Plaintiffs and remains factually implausible.

Complaint fails to offer the "meaningful benchmark" that *Matousek*, *Davis*, and *Meiners* require to create a plausible inference of imprudence.

### 1. Plaintiffs' Fee Comparison Does Not Account for the U.S. Bank Recordkeeping Fees for the Actual Period Being Compared.

To start, Plaintiffs fail to plausibly allege an apples-to-apples comparison of recordkeeping fees because they take the recordkeeping fees of eight comparators from one year—2018—but then, for the Plan, use the "U.S. Bank Plan Average Fee" for "the years *2016 through 2021*." Compl. ¶¶ 115-16 (emphasis added). This alone renders the comparison meaningless, for, as Plaintiffs concede, the Plan *reduced* the total amount of recordkeeping fees paid to Alight each year from 2017 to 2021—in fact, according to Plaintiffs' allegations, the Plan's 2021 recordkeeping fees were *23% less* than its 2017 fees. *See id.* ¶ 115. Taking the "average" for 2016-2021 thus bakes into that "average" the *higher fees* from the earlier (pre-2018) period—thus artificially inflating the Plan's asserted per-participant fee. And Plaintiffs' "average" reflects fees paid in *2016*—prior to the start of the putative Class Period in *2017*, *id.* ¶ 159—further undermining the proffered comparison.

### 2. Plaintiffs Fail to Allege the Actual Services Provided to the U.S. Bank Plan or to the Comparator Plans.

Plaintiffs also fail to describe *either* the specific services that Alight provides to the Plan *or* the specific services provided by the recordkeepers to the eight so-called "comparator plans," Compl. ¶¶ 115-19, making it impossible to determine whether

Plaintiffs' purported comparison rests on a "sound basis."[4]  *Meiners*, 898 F.3 at 822.  In

*Matousek*, plaintiffs similarly failed to allege the actual recordkeeping services provided,

which the court subsequently determined included "non-recordkeeping services," such as

"investment advice for those with self-directed brokerage windows; commissions for

individual trades; and trading, loan-origination, returned-payment, and check-service

fees," that were not included in certain of the comparator's fees (thus undermining any

purported comparison).  *See* 51 F.4th at 279-80.  Here, Plaintiffs offer at most only

conclusory allegations that the "comparator Plans . . . received the same level of quality

of services" as the Plan with no plausible factual basis for that claim.  Compl. ¶ 117.[5]

Conclusory allegations are insufficient to state a claim under Rule 12(b), *see Schulte*, 997

---

[4] Plaintiffs claim that, according to the Plan's 2022 participant fee disclosure, "the Plan's RKA [recordkeeping and administrative] fees include '[a]dministrative expenses: Fees paid to the recordkeeper to cover expenses for things like keeping data on participants, communication materials, internet services, and assisting participants with transactions; fees paid to a trustee to manage some operations of the Plan including trading and holding assets; plus fees paid for legal and accounting services.'"  Compl. ¶ 48.  But, as Plaintiffs admit, this is ***not a description of Alight's services to the Plan*** because it includes services provided by other service providers, such as "accounting services" that Plaintiffs state were provided by Ernst & Young.  *See id*. ¶ 115 n.2.  Accordingly, such an allegation does nothing to fill the gaps in Plaintiffs' fee comparison.

[5] Similarly broad, conclusory allegations throughout the Complaint are not only factually implausible, but contravene the Eighth Circuit's requirement in *Matousek* that plaintiffs provide plausible factual allegations asserting the challenged plan paid more for "the same services" as "similarly sized plans."  51 F.4th at 279.  *See* Compl. ¶¶ 53, 117 (claiming not only that the comparator plans received "the same level and quality of services" as the Plan, but that, for *every* retirement plan of the Plan's size, "there is no material difference between the services that are offered").

F.3d at 825, and courts have repeatedly dismissed similar recordkeeping claims relying on conclusory allegations that services were "similar."[6]

Appellate courts across the country have likewise confirmed that allegations failing to describe the services being compared cannot survive a motion to dismiss.  In *CommonSpirit*, 37 F. 4th at 1169, the Sixth Circuit affirmed dismissal of plaintiff's recordkeeping claims, finding plaintiff "has not pleaded that the services that CommonSpirit's fee covers are equivalent to those provided by the plans" in plaintiffs' fee comparison.  In *Albert*, the Seventh Circuit rejected plaintiffs' recordkeeping comparisons for being "devoid of allegations as to the quality or type of recordkeeping services the comparator plans provided."  47 F.4th at 579-80.  *See also Forman v. TriHealth*, 40 F.4th 443, 449 (6th Cir. 2022) (affirming dismissal of claims that "plan

---

[6] *See Probst v. Eli Lilly*, No. 22-cv-01106, 2023 WL 1782611, at *10 (S.D. Ind. Feb. 3, 2023) (allegations that "all mega plans receive nearly identical recordkeeping services and that any difference in services was immaterial to the price of those services" were "wholly conclusory and do nothing to identify what specific types of services comparator plans received relative to the Plan"); *Singh v. Deloitte LLP*, No. 21-CV-8458, 2023 WL 186679, at *5 (S.D.N.Y. Jan. 13, 2023) (allegation that "[n]early all recordkeepers in the marketplace offer the same range of services" did not provide requisite amount of specificity to support breach of the duty of prudence claim); *Laabs v. Faith Techs., Inc.*, No. 20-CV-1534, 2022 WL 17418358, at *3 (E.D. Wis. Nov. 9, 2022) (conclusory allegations that recordkeeping fees were excessive relative to the services rendered and that the defendant's plan "received a standard package of [recordkeeping] services" did not state a claim for breach of the duty of prudence); *Mator v. Wesco Distrib., Inc.*, No. 21-CV-00403, 2022 WL 3566108, at *4-5 (W.D. Pa. Aug. 18, 2022) (allegations that other recordkeepers "provided identical or similar services of the same quality . . . as those provided by [defendant's provider]" and that "[f]or large plans with greater than 5,000 participants, like the Plan, any minor variations in the way that these [recordkeeping] services are delivered have no material impact on the fees charged by recordkeepers to deliver the services" were insufficient to state a breach of the duty of prudence claim).

expenses were almost twice as high as other comparator plans" because plaintiffs "never alleged that these fees were high in relation to the services that the plan provided").[7] Here, too, Plaintiffs fail to provide such essential information, and Plaintiffs' allegations must be likewise rejected.

### 3.   Plaintiffs Fail to Allege Which Fees Are Included in Their Asserted Fee Comparison.

Plaintiffs likewise say nothing about the different types of fees paid to Alight or to the comparators' service providers, which further undermines any basis for a meaningful fee comparison.  First, while Plaintiffs allege that the Plan itself paid "both direct and indirect" recordkeeping fees during the relevant period, Compl. ¶ 74, they fail to state whether the alleged "average per-participant fee" for the Plan, or their proffered comparator fees, include direct compensation, indirect compensation, or both.  *See id.* ¶¶ 115-16.  And Plaintiffs' purported comparison chart conspicuously glosses over what the alleged "Total RKA Fees" include.  The Form 5500s, however, which Plaintiffs claim is the source of that data, show that six of the eight comparator plans did pay indirect compensation to their recordkeepers, but do not identify the actual amount of the indirect fees paid.[8]  Thus, Plaintiffs' allegations cannot possibly represent the *entire amount* of

---

[7] *See also Krutchen v. Ricoh USA, Inc.*, No. 22-cv-678, 2022 WL 16950264, at *3 (E.D. Pa. Nov. 15, 2022) ("A meaningful benchmark must include both the quality and type of recordkeeping services provided by comparator plans to show that identically situated plans received the same services for less."); *Riley v. Olin Corp.,* No. 4:21-cv-01328-SRC, 2023 WL 371872, at *3 (E.D. Mo. Jan. 24, 2023) (same).

[8] Specifically, the Form 5500s for six of Plaintiffs' comparators indicate that indirect compensation was paid, but the Form 5500s do not identify the specific amount of such compensation (as it is not required by the Department of Labor).  *See* App. 076 (Publicis Benefits Connection); App. 139 (Kaiser); App. 179 (Sutter Health); App. 219 (Google);

fees received by each of these recordkeepers or the Plan's recordkeeper so as to provide the requisite apples-to-apples comparison. *Fritton v. Taylor*, No. 22-cv-00415, 2022 WL 17584416, at *7 (D. Minn. Dec. 12, 2022) (rejecting recordkeeping fee comparison that did not consistently include indirect recordkeeping fees and where plaintiffs failed to allege how a second comparator "calculated the per-participant recordkeeping fees"); *Anderson v. Coca-Cola Bottlers' Ass'n*, No. 21-2054, 2022 WL 951218, at *11 (D. Kan. Mar. 30, 2022) (reasonableness of plan recordkeeping fees "may only be judged in the context of considering the total fees paid, including fees paid by indirect methods").[9]

Next, Plaintiffs allege that the recordkeeping expenses included plan-wide fees as well as "additional fees based on the conduct of individual participants" for services like loan processing and brokerage accounts, Compl. ¶ 49-51, but they fail to allege which, if any, of the comparator's fees similarly include both plan-wide fees and elective fees for individuals. It is thus impossible to determine whether their comparisons include the same types of fees and are a true "like-to-like" comparison. *See Matousek,* 51 F.4th at

---

App. 255 (Raytheon); App. 475 (Lowe's). The Form 5500s indicate that two of Plaintiffs' comparator plans did not pay indirect compensation to their recordkeepers in 2018. *See* App. 350 (Marriott); App. 397 (Apple).

[9] *See also Cunningham v. USI Ins. Servs., LLC,* No. 21 Civ. 1819, 2022 WL 889164, *5 (S.D.N.Y. Mar. 25, 2022) ("Plaintiff fails to specify how she calculated the Plan's indirect fees because they are not available by themselves on the Form 5500 filings. . . In fact, nowhere in the Complaint does Plaintiff provide any figures, estimates, or formulas from which the Court could reasonably infer [how] Plaintiff obtained such results."); *Gonzalez v. Northwell Health, Inc.*, No. 20-CV-3256 (RPK) (RLM), 2022 WL 4639673, at *10 (E.D.N.Y. Sept. 30, 2022) (because plaintiff's calculations did not include indirect compensation, they provided "little insight into whether total recordkeeping fees—*i.e.*, accounting for any indirect payments—paid by . . . plan participants are higher or lower than the total recordkeeping fees paid by plaintiff and other Plan participants").

279-80 (rejecting comparisons where plaintiffs failed to allege whether fees included

elective charges "against the account of individual participants rather than on a plan-wide

basis," such as loan origination or self-directed brokerage window fees).

### 4.   Plaintiffs' Comparator Plans Are Not "Similarly Sized" to the U.S. Bank Plan, as *Matousek* Requires.

Plaintiffs' fee comparison fails for still another reason: none of the so-called

"comparator" plans are, in fact, "similarly sized," as *Matousek* requires.  Instead, those

plans have significantly different numbers of participants and/or plan assets than the U.S.

Bank Plan.  As Plaintiffs concede, the size of a plan may significantly impact the

negotiated price of recordkeeping services.  *See* Compl. ¶ 33 ("In 2021, the Plan had

about $9,869,704,841 in assets . . . [and] thus had substantial bargaining power regarding

Plan fees and expenses.").  But every one of Plaintiffs' eight comparator plans has

significant divergences in either the number of participants or the amount of net assets (or

both), as compared with the U.S. Bank Plan.  The following chart reproduces Plaintiffs'

recordkeeping fee chart (*see* Compl. ¶ 116), but adds the two highlighted columns to

show the difference in the number of participants and plan assets between each

comparator plan and the U.S. Bank Plan, based, again, on Plaintiffs' own data:

| Plan | Number of Plan Participants | Difference From U.S. Bank Plan | Amount of Plan Assets | Difference from U.S. Bank Plan |
|---|---|---|---|---|
| **U.S. Bank Plan "Average"** | **87,317** | **n/a** | **$7,556,201,856** | **n/a** |
| Publicis Benefits Connection 401K Plan | 42,316 | **-45,001** | $2,547,763,175 | **-$5,008,438,681** |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | **-39,959** | $3,104,524,321 | **-$4,451,677,535** |
| Sutter Health 403(B) Savings Plan | 73,408 | **-13,909** | $3,681,162,013 | **-$3,875,039,843** |
| Google LLC 401(K) Savings Plan | 82,725 | **-4,592** | $11,786,824,293 | **$4,230,622,437** |
| Raytheon Savings and Investment Plan | 82,788 | **-4,529** | $17,243,679,305 | **$9,687,477,449** |
| Marriott International, Inc. Employees' Profit Sharing Plan | 115,501 | **28,184** | $7,660,619,525 | **$104,417,669** |
| Apple 401(K) Plan | 115,686 | **28,369** | $7,400,046,748 | **-$156,155,108** |
| Lowe's 401(K) Plan | 154,402 | **67,085** | $5,619,838,861 | **-$1,936,362,995** |

None of Plaintiffs' so-called "comparator plans" are actually comparable to the U.S. Bank Plan. In terms of total participants, the Publicis and Kaiser plans each have almost *40,000 fewer* participants than the U.S. Bank Plan, whereas the Apple and Marriott plans each have almost *30,000 more* participants—and the Lowe's plan has fully *67,000 more* participants than the U.S. Bank Plan. In terms of net assets, the Publicis, Kaiser, and Sutter Health plans each have *less than half* the plan assets of the U.S. Bank Plan, while the Google plan has over *$4.2 billion more* in assets, and Raytheon has over *$9.6 billion more* in assets.[10]

---

[10] In addition, while Plaintiffs calculate the recordkeeping fee in terms of Plan participants, if we use Plaintiffs' data to calculate fees in terms of net assets (i.e., dividing

*Matousek*, again, rejected similar excess recordkeeping fee comparisons because plaintiffs' comparison involved "smaller plans . . . with less than half the number of participants and under a quarter of the total assets" as defendant's plan and therefore failed to provide a "meaningful benchmark."  51 F.4th at 280.  Other courts have similarly repeatedly rejected fee comparisons that rested on such apples-to-oranges comparisons with dissimilar plans, including just last week when the Southern District of Ohio rejected a nearly identical list of so-called comparators offered by Plaintiffs' same counsel as here.  *Sigetich*, 2023 WL 2431667, at *4, *8-10 (dismissing claims based on comparisons to the Kaiser Permanente, Sutter Health, Marriott, Apple, and Lowe's plans, finding that the "differences in size" between defendants' plan and the comparator plans "call into question" whether the other plans were "comparable and whether the [defendant's] Plan's recordkeeping fees were excessive relative to the services rendered").  *See also CommonSpirit*, 37 F.4th at 1169 (affirming dismissal of plaintiffs' recordkeeping claims based on fee comparisons with "some of the smallest plans on the market, which might offer fewer services and tools to plan participants"); *Eli Lilly*, 2013 WL 1782611, at *11 (because "the comparator plans are not all similar in size to the Plan, nor do they have similar assets . . . [they] call into question [plaintiff's] characterization

---

each plan's alleged total recordkeeping fees by its assets), Plaintiffs' data states the Plan paid only 0.048% of its total plan assets in recordkeeping fees—which is *lower* than the fees paid on a net-asset basis by either the Sutter Health plan (paying 0.0518%) or the Lowe's plan (paying 0.0508%), although Plaintiffs claim both plans paid "reasonable" recordkeeping fees.  This is not to accept Plaintiffs' so-called "comparators" as meaningful benchmarks, but to show that *even using Plaintiffs' own purported comparators and data*, the Plan's fees can arbitrarily shift from "unreasonable" to "reasonable" based on how the same fees are assessed.

of the comparator plans as being of similar sizes with similar amounts of money under management"); *Mator*, 2022 WL 3566108, at *8 (finding "disparities" in the number of participants and net assets in the comparator plans "raise serious doubt as to [the] plausibility of how the purported comparator plans are indeed comparable"). Plaintiffs fail to compare the U.S. Bank Plan with "similarly sized plans" and, lacking a meaningful benchmark, their excessive recordkeeping fee allegations must be dismissed.[11]

### D.   **Plaintiffs' Managed Account Fee Allegations Fail to State a Claim.**

Plaintiffs' second claim—that the "managed account services" offered to participants by AFA through the "Professional Management" program were somehow reflective of an imprudent monitoring process—also fails as a matter of law. Compl. ¶¶ 138-57. As with their recordkeeping claim, Plaintiffs hope to show that fees for the managed account services offered to Plan participants as an additional, optional benefit

---

[11] In addition, Plaintiffs make the speculative and wholly conclusory allegation that "Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers," Compl. ¶ 113, which the Court need not accept as true for purpose of a motion to dismiss under Rule 12. *See Schulte*, 997 F.3d at 825 (court need not consider conclusory allegations on Rule 12 motion); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 555 (2008) ("Factual allegations must be enough to raise a right to relief above the speculative level." (citations omitted)). In addition, courts have repeatedly "rejected the notion that a failure to regularly solicit quotes or competitive bids from service providers breaches the duty of prudence." *Albert*, 47 F.4th at 579; *see Riley v. Olin Corp.*, No. 21-CV-01328, 2022 WL 2208953, at *5 (E.D. Mo. June 21, 2022), reconsideration denied, No. 4:21-CV-01328, 2023 WL 371872 ("For starters, 'the allegation that the Plan fiduciaries were required to solicit competitive bids on a regular basis has no legal foundation.'" (quoting *White v. Chevron Corp.*, No. 16-cv-793, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016))). Thus, such allegations fail to state a claim under Rule 12.

were higher than the fees six comparator plans paid for allegedly "identical managed account services." *See id.* ¶ 143. Plaintiffs' allegations fail on all fronts.

Plan participants are free to choose whether to use AFA to assist in allocating their retirement savings among the Plan's different investment options. As Plaintiffs concede, the Plan's annual fee disclosures described these optional services and their fees. *See* Compl. ¶ 142; App. 001-002. Participants who are not interested in a personalized asset allocation service can choose their plan investments themselves or solicit the services of another professional financial advisor. Simply offering this elective service does not support a claim for breach of fiduciary duty. *See Loomis v. Exelon Corp.*, 658 F.3d 667, 673-74 (7th Cir. 2011); *Rosen v. Prudential Ret. Ins. & Annuity Co.*, No. 3:15-cv-1839, 2016 WL 7494320, at *16 (D. Conn. Dec. 30, 2016), *aff'd*, 718 F. App'x 3 (2d Cir. 2017) (dismissing claim that defendant imprudently offered Prudential asset allocation service, noting "[i]t is undisputed that the [asset allocation] program was optional for Plan participants").[12]

Furthermore, even assuming Plaintiffs could demonstrate a plausible fiduciary breach based only on offering a purely optional Plan service, they fail to provide to a "meaningful benchmark" as *Matousek* requires. 51 F.4th at 279. As with their

_____

[12] Plaintiffs, for instance, allege that plan fiduciaries acted imprudently by offering AFA's managed account services when comparable services were available for less money in the form of target date funds ("TDFs"). Compl. ¶ 92. Not only is such an allegation purely conclusory (asserting without basis that AFA's services amounted to nothing except the shifting asset allocation of a TDF), but the Plan *did* offer a suite of Vanguard TDFs throughout the relevant period, which Plaintiff Dionicio invested in. *See id.* ¶ 21.

recordkeeping claims, Plaintiffs purport to compare the Professional Management

services offered by AFA to the managed account services offered by six purported

comparator plans in hopes of showing the comparators' rates were "significantly lesser"

than those paid by U.S. Bank Plan participants.  *See* Compl. ¶¶ 143-44.  These

comparisons fail for multiple reasons.

*First*, Plaintiffs fail to provide even the most basic information regarding their

asserted fee comparison.  Specifically, they (a) fail to identify the source of that

information (thereby preventing any inquiry into whether their allegations are factually

plausible); (b) fail to identify the service provider allegedly providing the "managed

account services" identified in their comparison chart (further undermining the

plausibility that the services are "similar"); (c) fail to describe the actual services

provided by AFA in its Professional Management program; and (d) fail to describe the

actual account services allegedly offered to the proffered comparator plans.  Instead,

Plaintiffs fall back on the purely conclusory allegation that "[a]ll the comparator Plans

provide the exact same managed account services," *see* Compl. ¶ 145—an allegation that

is demonstrably false according to the Government Accountability Report that Plaintiffs

rely on.  *See id*. ¶ 152 (citing The United States Government Accountability Office

("GAO"), *401(k) Plans: Improvements Can Be Made to Better Protect Participants in

Managed Accounts* (June 2014) ("GAO Report"), at 32,

https://www.gao.gov/assets/670/664391.pdf).  The GAO reported on studies of various

managed account service providers in the market and emphasized the wide range of

services offered, noting that the providers "use different investment options, employ

varying strategies to develop and adjust asset allocations for participants, incorporate

varying types and amounts of participant information, and rebalance participant accounts

at different intervals.  As a result, participants with similar characteristics in different

plans may have differing experiences."[13]

Under *Matousek*, Plaintiffs' failure to provide nearly ***any information*** regarding

their purported fee comparison renders such comparison wholly inapt.  *See Glick*, 2022

WL 16927749, at *4 (dismissing managed account service fee claims because complaint

"does not describe the *specific services* provided" and does "not contain *any* factual

allegations showing that the plans are in fact similarly situated"); *Laabs*, 2022 WL

17418358, at *4-5 (dismissing managed account service allegations that merely alleged

"low-cost" alternatives were available but failed to provide "more detailed allegations" to

show "plaintiff put forward an appropriate comparator—that is a 'meaningful

benchmark'").

***Second***, Plaintiffs claim further that, like AFA's Professional Management

services, the comparator plans reduce their service fees progressively across three tiers

based on the amount of participant assets under management.  Compl. ¶¶ 143-44.

Plaintiffs allege that AFA's managed account fees were 0.60% for the first $100,000,

then 0.45% for the next $150,000, and 0.30% for all assets over $250,000.  *Id*. ¶ 142.  But

---

[13] GAO Report at 14.  Courts have cited precisely this language in rejecting similar conclusory allegations from plaintiffs' same counsel.  *See Glick v. ThedaCare*, No. 20-CV-1236, 2022 WL 16927749 at *4 (E.D. Wisc. Oct. 27, 2022) (quoting GAO Report and finding that, "while the basic service may generally be the same, each managed account service provider may go about offering that service in a different manner.  And the variance in that process may, in some cases, explain the difference in fees charged.").

Plaintiffs do not state how any of the comparator plans define their fee tiers—referring in their chart only to "1st Tier," "2nd Tier," "3rd Tier" with no explanation of the amount of assets under management for each tier for each plan and provider. *See id*. ¶ 143. In fact, for the Verso plan, Plaintiffs state that the fees for the second and third tiers are "N/A," suggesting (without explanation) that the "1st Tier" somehow encompasses these other (also undefined) fee tiers. *Id*. As a result, it is impossible to tell—even accepting Plaintiffs' comparisons—whether the same participant would pay more under the Plan than under one of the comparator plans, as the lower fees for the Plan's second or third tiers might apply when a comparator plan's first-tier fees still were in effect. The Complaint provides none of the necessary clarity or context, demonstrating why Plaintiffs' managed account allegations lack a meaningful benchmark.

*Third*, Plaintiffs fail to plausibly allege that the comparator plans are "similarly sized plans" or otherwise comparable to the U.S. Bank Plan, omitting even the most basic information about these plans (e.g., number of participants and total assets of each plan) from their allegations. *See id*. But Plaintiffs allege that "Defendants unreasonably failed to leverage the size of the Plan to pay reasonable fees for Plan RKA and managed account services." *Id*. ¶ 9. So, according to Plaintiffs' own logic (as well as the requirements of *Matousek*), Plaintiffs must allege that they are comparing the Plan's fees with fees of "similarly sized plans" with similar "leverage." Yet Plaintiffs fail to do so. Accordingly, their managed account service claim fails because, as *Matousek* held, such context is required to assert the "meaningful" fee comparison that *Meiners* requires. *See Matousek*, 51 4th at 279 ("Even if the fees here look high, we cannot infer imprudence

unless *similarly sized plans* spend less on the same services." (emphasis added)).  *See also Glick*, 2022 WL 16927749, at *4 (dismissing allegations of excessive managed account fees when, as here, plaintiffs failed to allege that "the plans are in fact similarly situated," as plaintiffs' fee comparison table "doesn't even list the number of participants or asset size of the comparator plans").

Furthermore, when the missing number of participants and plan assets is added to Plaintiffs' chart based on the Form 5500 filings for each plan in the relevant year,[14] it is evident that Plaintiffs' comparator plans are starkly different from the U.S. Bank Plan:

| Plans | Year | Active Participants[15] | Difference from U.S. Bank Plan Participants (2021) | Net Assets[16] | Difference from U.S. Bank Plan Assets (2021) |
|---|---|---|---|---|---|
| U.S. Bank 401(k) Saving Plan | 2021 | 88,195 | n/a | $9,869,704,841 | n/a |

---

[14] The Complaint refers to the Plan's fees as of 2022, but the table below refers to the most recent Form 5500 filed by the Plan, which was in 2021.  Plaintiffs' chart also refers to the "Caterpillar Sponsored 401(k) Plans."  Comp. ¶ 143.  Caterpillar offered two 401(k) defined contribution plans in 2016: the Caterpillar 401(k) Retirement Plan and the Caterpillar 401(k) Savings Plan.  The table reflects the combined participants and assets of these plans.

[15] This information is provided on each plan's Form 5500, Part II, line 6g.  *See* App. 503 (U.S. Bank); App. 557 (Verso); App. 607 (AGFA); App. 642 (Caterpillar Retirement Plan); App. 688 (Caterpillar Savings Plan); App. 734 (Citigroup); App. 871 (J.C. Penny); App. 954 (Comcast).

[16] This information is provided on each plan's Form 5500, Schedule H (Financial Information), Part I, line 1*l* (net assets at end of year).  *See* App. 526 (U.S. Bank); App. 578 (Verso); App. 620 (AGFA); App. 658 (Caterpillar Retirement Plan); App. 704 (Caterpillar Savings Plan); App. 767 (Citigroup); App. 888 (J.C. Penny); App. 967 (Comcast).

| Plans | Year | Active Participants[15] | Difference from U.S. Bank Plan Participants (2021) | Net Assets[16] | Difference from U.S. Bank Plan Assets (2021) |
|---|---|---|---|---|---|
| Verso Retirement Savings Plan | 2021 | 2,210 | -83,985 | $346,192,939 | -$9,523,511,902 |
| AGFA Healthcare Corp. Employee Savings Plan | 2018 | 763 | -85,432 | $153,973,027 | -$9,715,731,814 |
| Caterpillar Sponsored 401(k) Plans | 2016 | 47,631 | -38,564 | $8,815,634,608 | -$1,054,070,233 |
| Citi Retirement Savings Plan | 2015 | 139,947 | 53,752 | $11,436,037,587 | $1,566,332,746 |
| JC Penney 401(k) Savings Plan | 2015 | 85,980 | -215 | $2,699,558,000 | -$7,170,146,841 |
| Comcast Corp. Retirement Investment Plan | 2019 | 137,035 | 50,840 | $12,633,875,411 | $2,764,170,570 |

The differences between the Plan and Plaintiffs' so-called comparators could not be more extreme: the AGFA plan, for instance, has *less than 0.9%* of the participants of the Plan, whereas the Citi plan has over *53,000 more* participants than the Plan. Likewise, in terms of net assets, the Verso plan has *less than 4%* of the assets of the U.S. Bank Plan and the JC Penny plan has *$7.1 billion less* in assets, while the Comcast plan has *$2.7 billion more* in assets. Furthermore, rather than comparing the fees allegedly paid by the comparator plans for the same year, the fees haphazardly span an eight-year period from 2015 to 2021, with *half* of the purported fees taken from before the start of the 2017 putative class period (thus, a period in which Plaintiffs do not even allege any wrongdoing). Accordingly, Plaintiffs' fee comparisons fail to provide the "sound" and

"meaningful benchmark" required by *Matousek* and *Meiners*, and the court cannot plausibly infer, on these allegations alone, that Defendants breached their fiduciary duties to act prudently toward the Plan.[17]

E.   **Plaintiffs Fail to State a Plausible Claim for Failure-to-Monitor Other Plan Fiduciaries.**

Plaintiffs also allege that Defendants breached a duty to monitor other Plan fiduciaries.  *See* Compl. ¶¶ 192-205.  Those claims fail because they are wholly derivative causes of action that rise and fall with Plaintiffs' principal claims for fiduciary breach.  *See Albert*, 47 F.4th at 583.

IV.   **CONCLUSION**

For the reasons above, the Court should dismiss Plaintiffs' Complaint with prejudice.

Date: March 15, 2023

*/s/ Melissa D. Hill*
Melissa D. Hill (pro hac vice)
Christopher Diffee (pro hac vice)
William Engelhart (pro hac vice)
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178
212-309-6000
212-309-6001 (fax)
melissa.hill@morganlewis.com
christopher.diffee@morganlewis.com
william.engelhard@morganlewis.com

---

[17] The Complaint alleges that "other managed account providers" such as Betterment, Vanguard, and Charles Schwab provided "virtually identical" services for less than AFA. Compl. ¶ 146.  But this conclusory allegation need not be accepted, and it similarly fails to allege the actual services provided by these entities, much less compare them to the specific services offered by AFA.

Daniel J. Supalla (#0387064)
Maria S. Agostinho Campbell (#0401778)
Nilan Johnson Lewis PA
250 Marquette Avenue South, Suite 800
Minneapolis, MN 55401
612-305-7500
612-305-7501 (fax)
dsupalla@nilanjohnson.com
MACampbell@nilanjohnson.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF WORD COUNT COMPLIANCE</u>

I, Melissa D. Hill, certify that **Memorandum of Law in Support of Defendant's Motion to Dismiss Plaintiffs' Complaint** complies with the word limits in Local Rule 7.1(f) and with the type-size limit of Local Rule 7.1(h).

I further certify that, in preparation of this Memorandum, I used Microsoft Word, and that this word processing program has been applied specifically to include all text, including headings, footnotes, and quotations, in the following word count.  I further certify that the aforementioned Memorandum contains 7,661 words.

Dated: March 15, 2023              Respectfully submitted,

By: */s/ Melissa D. Hill*