## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

|  |  |
|---|---|
| ANA L. DIONICIO and ALEJANDRO M. WESAW, individually, and as a representative of a Class of Participants and Beneficiaries of the U.S. Bank 401(k) Savings Plan,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. Bancorp, the Board of Directors of U.S. Bancorp, and U.S. Bancorp's Benefits Administration Committee and U.S. Bancorp's Investment Committee,<br><br>Defendants. | Case No. 0:23-cv-00026-PJS-JFD |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Melissa D. Hill (pro hac vice)
Christopher Diffee (pro hac vice)
William Engelhart (pro hac vice)
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178
212-309-6000
212-309-6001 (fax)
melissa.hill@morganlewis.com
christopher.diffee@morganlewis.com
william.engelhart@morganlewis.com

Daniel J. Supalla (#0387064)
Maria S. Agostinho Campbell (#0401778)
Nilan Johnson Lewis PA
250 Marquette Avenue South, Suite 800
Minneapolis, MN 55401
612-305-7500
612-305-7501 (fax)
dsupalla@nilanjohnson.com
MACampbell@nilanjohnson.com

## <u>TABLE OF CONTENTS</u>

Page

I.      INTRODUCTION ............................................................................................. 1

II.     RELEVANT FACTUAL BACKGROUND..................................................... 3

III.    ARGUMENT..................................................................................................... 5

        A.      Legal Standard ....................................................................................... 5

        B.      The Eighth Circuit Requires Plaintiffs To Allege A "Meaningful
                Benchmark" To State A Claim For Imprudence Based On Excessive Plan
                Fees. ....................................................................................................... 6

        C.      Plaintiffs' Recordkeeping Fee Claims Fail Because They Do Not Allege A
                "Meaningful Benchmark." ....................................................................... 8

                1.      Plaintiffs' Comparator Plans Are Not "Similarly Sized" To The
                        U.S. Bank Plan. ........................................................................... 9

                2.      Plaintiffs Fail To Allege Any Facts About The Services Provided
                        To The U.S. Bank Plan Or Their Comparator Plans................. 12

                3.      Even Plaintiffs' Bare Fee Allegations Do Not Support A
                        "Meaningful Benchmark." ......................................................... 14

                4.      Judicially Noticeable Information Shows Plaintiffs' Fee
                        Comparisons Are Implausible And Fail To Allege A Meaningful
                        Benchmark. ................................................................................ 17

        D.      Plaintiffs' Managed Account Fee Allegations Fail To State A Claim................. 20

        E.      Plaintiffs' Claim For Failure To Monitor Other Plan Fiduciaries Must Be
                Dismissed. ............................................................................................. 26

IV.     CONCLUSION................................................................................................ 26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albert v. Oshkosh*,
 47 F.4th 570 (7th Cir. 2022) ..................................................................................8, 14, 20, 26

*Anderson v. Coca-Cola Bottlers' Ass'n*,
 No. 21-2054-JWL, 2022 WL 951218 (D. Kan. Mar. 30, 2022) .............................................16

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)................................................................................................................20

*Cunningham v. USI Ins. Servs., LLC*,
 No. 21 Civ. 1819 (NSR), 2022 WL 889164 (S.D.N.Y. Mar. 25, 2022) .................................17

*Davis v. Wash. Univ. in St. Louis*,
 960 F.3d 478 (8th Cir. 2020) ...............................................................................................5, 6

*Forman v. TriHealth, Inc.*,
 40 F.4th 443 (6th Cir. 2022) ..................................................................................................14

*Fritton v. Taylor*,
 No. 22-cv-00415, 2022 WL 17584416 (D. Minn. Dec. 12, 2022) .........................................16

*Glick v. ThedaCare*,
 No. 20-CV-1236, 2022 WL 16927749 (E.D. Wis. Oct. 27, 2022)....................................22, 23

*Gonzalez v. Northwell Health, Inc.*,
 No. 20-CV-3256 (RPK) (RLM), 2022 WL 4639673 (E.D.N.Y. Sept. 30, 2022)...................17

*Guyes v. Nestle USA*,
 No. 20-CV-1560-WCG-SCD, 2022 WL 18106384 (W.D. Wis. Nov. 21, 2022).....................9

*Hughes v. Northwestern Univ.*,
 63 F.4th 61 (7th Cir. Mar. 23, 2023)........................................................................................8

*Johnson v. PNC Fin. Servs. Grp., Inc.*,
 No. 2:22-CV-01493-CCW, 2021 WL 3417843 (W.D. Pa. Aug. 3, 2021) .............................19

*U.S. ex rel. Kraxberger v. Kan. City Power & Light Co.*,
 756 F.3d 1075 (8th Cir. 2014) .............................................................................................5, 6

*Krutchen v. Ricoh USA, Inc.*,
No. 22-cv-678, 2022 WL 16950264 (E.D. Pa. Nov. 15, 2022) ................................................8

*Krutchen v. Ricoh USA, Inc.*,
No. CV 22-678, 2023 WL 3026705 (E.D. Pa. Apr. 20, 2023) ...............................9, 13, 14, 22

*Laabs v. Faith Techs., Inc.*,
No. 20-CV-1534-WCG-SCD, 2022 WL 17418358 (E.D. Wis. Nov. 9, 2022) ................13, 22

*Loomis v. Exelon Corp.*,
658 F.3d 667 (7th Cir. 2011) .................................................................................................20

*Mator v. Wesco Distrib., Inc.*,
No. 21-CV-00403-MJH, 2022 WL 3566108 (W.D. Pa. Aug. 18, 2022)....................11, 13, 22

*Matousek v. Mid-Am. Energy Co.*,
51 F.4th 274 (8th Cir. 2022) ............................................................................................ *passim*

*McCaffree Fin. Corp. v. ADP, Inc.*,
No. 20-5492 (ES) (JRA), 2023 WL 2728787 (D.N.J. Mar. 31, 2023) ....................................25

*Meiners v. Wells Fargo & Co.*,
898 F.3d 820 (8th Cir. 2018) ........................................................................................1, 6, 12

*Probst v. Eli Lilly & Co.*,
No. 22-cv-01106-JMS-MKK, 2023 WL 1782611 (S.D. Ind. Feb. 3, 2023)...............11, 13, 22

*Riley v. Olin Corp.*,
No. 4:21-cv-01328-SRC, 2023 WL 371872 (E.D. Mo. Jan. 24, 2023) ....................................8

*Riley v. Olin Corp.*,
No. 4:31-cv-01328-SRC, 2022 WL 2208953 (E.D. Mo. June 21, 2022) ................................20

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
No. 3:15-cv-1839 (VAB), 2016 WL 7494320 (D. Conn. Dec. 30, 2016) ...............................20

*Schulte v. Conopco, Inc.*,
997 F.3d 823 (8th Cir. 2021) ..................................................................................5, 13, 20, 22

*Sigetich v. Kroger Co.*,
21-cv-697, 2023 WL 2431667 (S.D. Ohio Mar. 9, 2023) ......................................................11

*Singh v. Deloitte LLP*,
No. 21-cv-8458 (JGK), 2023 WL 186679 (S.D.N.Y. Jan. 13, 2023) ...............................13, 22

*Smith v. CommonSpirit Health*,
   37 F.4th 1160 (6th Cir. 2022) ....................................................................................8, 11, 14, 25

*Wehner v. Genentech, Inc.*,
   No. 20-cv-06894-WHO, 2021 WL 507599 (N.D. Cal. Feb. 9, 2021) ......................................19

*White v. Chevron Corp.*,
   No. 16-cv-793-PJH, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016))) ....................................20

*Will v. Gen. Dynamics Corp.*,
   No. 3:06-cv-00698-GPM .........................................................................................................19

**Statutes**

29 U.S.C. § 1104...............................................................................................................................5

29 U.S.C. § 1113.............................................................................................................................26

I.      **INTRODUCTION**

Plaintiffs, two former participants in the U.S. Bank 401(k) Savings Plan (the "U.S. Bank Plan" or "Plan"), allege that U.S. Bancorp, the Board of Directors of U.S. Bancorp, U.S. Bancorp's Benefits Administration Committee, and U.S. Bancorp's Investment Committee (together, "U.S. Bank" or "Defendants") breached their fiduciary duties under the Employee Retirement Income Security Act ("ERISA") by failing to monitor and control the Plan's recordkeeping and managed account service fees, leading to purportedly "excessive" compensation to two Plan service providers.  ECF No. 28 (Amended Complaint ("AC")) ¶¶ 111-57.  In cases like this, to plausibly claim that retirement plan fees were excessive, a plaintiff must allege a "meaningful benchmark" by "identify[ing] similar plans offering the same services for less."  *Matousek v. Mid-Am. Energy Co.*, 51 F.4th 274, 278-80 (8th Cir. 2022) (affirming dismissal of nearly identical claims of excessive plan fees); *see also Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018) (a plaintiff must "provide a sound basis for comparison—a meaningful benchmark" to support a claim that plan fees were excessive).  Plaintiffs' Amended Complaint falls far short of this standard.

For their recordkeeping claims, Plaintiffs' only attempt at alleging a "meaningful benchmark" comes in the form of a chart claiming to show that the Plan's recordkeeping fees were higher than those allegedly paid by five other retirement plans, which they contend were reasonable.  AC ¶ 99.  Plaintiffs' "reasonable fee" is a moving target impossible to hit.  In their original complaint, Plaintiffs (incorrectly) alleged the Plan paid $41 per person in recordkeeping fees, whereas purportedly "similar" plans paid $18 to

$28 per participant.  When Defendants' motion to dismiss that complaint showed Plaintiffs were wrong about the Plan's fee, they amended their pleading, conceding Plan participants paid only *$29* per year—*one dollar more than the fees Plaintiffs previously alleged were prudent.*  But, at the same time, Plaintiffs moved the goal post, replacing their prior comparator plans with a new slate of allegedly "similar" plans that they claim paid even less.  Plaintiffs' shifting comparators give away the game.

Beyond this, the Amended Complaint on its face fails to satisfy the *Matousek* standard.  **First**, Plaintiffs offer no factual allegations regarding the recordkeeping services provided to the Plan or Plaintiffs' five comparator plans.  Thus it is impossible to know whether Plaintiffs offer an "apples-to-apples" comparison of fees for "the *same services*," as *Matousek* requires.  51 F.4th at 279 (emphasis added).  **Second**, *Matousek* requires Plaintiffs to benchmark the Plan's fees against those paid by "similarly sized plans" with comparable numbers of participants and plan assets, recognizing that plan size may determine the complexity of services and negotiating leverage.  *Id.* at 279-80.  Yet Plaintiffs' comparator plans are materially different than the Plan—some have *half* the number of participants, others *twice* the assets.  **Third**, the Amended Complaint lacks information about which fees are even included in their price-tag comparison.  Without the necessary context, there can be no meaningful fee comparison.

Plaintiffs' managed account claims suffer the same flaws.  Plaintiffs offer a scantly detailed chart purporting to compare the Plan's managed account service fees against those of six other plans.  But, again, Plaintiffs fail to allege any facts showing that "similarly sized plans spend less on the same services."  *Id.*  **First**, like the recordkeeping

fee claims, the Amended Complaint is devoid of factual allegations regarding the specific managed account services provided to the Plan or the comparator plans, or even which entities provided them. **Second**, Plaintiffs fail to allege their comparator plans are "similarly sized," and publicly available information shows quite the opposite—the plans are significantly different in participants and assets. **Third**, Plaintiffs purport to compare fees across three tiers based on the amount of assets under management, but fail to allege the amounts comprising each tier, rendering it impossible to meaningfully compare even the fees across different plans. Lacking any "meaningful comparison," Plaintiffs' managed account service claims should be dismissed.

The Amended Complaint boils down to conclusory allegations that "costs are too high." Yet the Eighth Circuit has held that such allegations fail to state a plausible claim. *Id.* at 278-80. The Court should therefore dismiss Plaintiffs' Amended Complaint with prejudice.

## II.    RELEVANT FACTUAL BACKGROUND

To provide retirement benefits for eligible employees, U.S. Bank sponsors the Plan, a defined contribution retirement plan that, in 2021, had over 86,000 participants and $9.8 billion in assets. AC ¶¶ 40-41. Like many large retirement plans, the Plan relies on nationally recognized service providers to assist in its administration. Alight Solutions ("Alight") provided the Plan with what are known as "recordkeeping" services, which may include—among other things—maintaining account balances and tracking assets in participant accounts, issuing plan documents and participant communications, maintaining call centers, and providing access to a plan-related website and internet

3

account.  *Id*. ¶ 48.  In addition, Alight Financial Advisors ("AFA") offered optional managed account services, called Professional Management, to Plan participants who elected such service.  *Id*. ¶ 69.[1]

The Plan's service providers receive different types of fees from different sources. First, there are **required plan-wide fees** paid by all participants for services used equally across the Plan, including recordkeeping, trustee, legal, and accounting services.  AC ¶¶ 47-48.  Second, there are **individual elective fees** for services offered on a voluntary basis, which are paid only by the individual participants who elect to use those services. *Id*. ¶¶ 53-54.  Such elective services include Professional Management, which offers Plan participants personalized portfolio management from professional investment advisors in exchange for a monthly fee based on the amount of assets being managed—0.60% for the first $100,000, 0.45% for the next $150,000, and 0.30% for all assets over $250,000.  *Id*. ¶¶ 69-83.  Third, there are additional **ad hoc fees paid by the Plan**, such as "ESOP fees, fees for service, and terminated maintenance fees."  *Id*. ¶¶ 55-56.  Fourth, certain Plan investment options pay a designated portion of their stated fee to Alight "in exchange for providing services that would otherwise have to be provided by the mutual fund."  *Id*. ¶¶ 67-68.  This is known as "revenue sharing" or "**indirect compensation**" to distinguish it from fees paid directly by Plan participants to Alight.  *Id*. ¶ 67.

---

[1] The Plan also relied on other third-party entities to provide legal, accounting, trustee, custodial, brokerage, insurance, and investment consulting services to the Plan and its participants, none of which are at issue in this action.

Here, Plaintiffs contend that Defendants allowed the Plan to pay excessive recordkeeping fees to Alight and excessive managed account fees to AFA.  AC ¶¶ 94-139.

## III.   ARGUMENT

### A.   Legal Standard

To state a viable claim for a fiduciary breach under ERISA, Plaintiffs must plead factual allegations plausibly showing Defendants failed to act "with the care, skill, prudence, and diligence under the circumstances then prevailing" that a prudent person would use.  29 U.S.C. § 1104(a)(1)(B).  This "prudent person" analysis is based on "an objective standard that focuses on the process by which decisions are made, rather than the results of those decisions."  *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 482 (8th Cir. 2020) (citation omitted).  A retirement plan fiduciary is not required "to scour the market to find and offer the cheapest possible fund" or ensure that participants pay the lowest fees available, but only to undertake a prudent process to monitor and control plan fees.  *Id.* at 486.  Where, as here, a complaint lacks direct allegations about the fiduciary's process, a plaintiff must allege enough facts for the Court to "*infer . . . that the process was flawed.*"  *Id*. at 482–83.  Although the Court must accept well-pled facts as true, it "need not accept as true a plaintiff's conclusory allegations or legal conclusions drawn from the facts."  *Schulte v. Conopco, Inc.*, 997 F.3d 823, 825 (8th Cir. 2021).[2]

---

[2] A court considering a Rule 12(b)(6) motion may also consider, as "matters incorporated by reference or integral to the claim, items subject to judicial notice, and matters of public record."  *U.S. ex rel. Kraxberger v. Kan. City Power & Light Co*., 756 F.3d 1075, 1083 (8th Cir. 2014).  Here, Plaintiffs' Amended Complaint directly quotes from the Plan's 2022 participant fee disclosure (provided pursuant to 29 C.F.R. § 2550.404a-5), *see* AC ¶¶ 48, 54, 56, 66, 72, 98, 122, and 126, and from the Form 5500s filed with the

B.    **The Eighth Circuit Requires Plaintiffs To Allege A "Meaningful Benchmark" To State A Claim For Imprudence Based On Excessive Plan Fees.**

The Eighth Circuit has repeatedly held that, to state a viable excessive fee claim, a complaint must provide plausible factual allegations establishing a "meaningful benchmark" on which to infer fees are unreasonable.  *Matousek*, 51 F.4th at 278 (affirming dismissal of recordkeeping fee claims for failing to allege "a meaningful benchmark"); *Davis*, 960 F.3d at 484-85 (affirming dismissal of fiduciary breach claim because complaint failed to plead a "meaningful benchmark"); *Meiners*, 898 F.3d at 822 (same).  This is the "key to nudging an inference of imprudence from possible to plausible."  *Matousek*, 51 F.4th at 278.  A "meaningful benchmark" requires a "like-for-like comparison" based on plausible factual allegations that "similarly sized plans spend less on the same services" as the challenged plan.  *Id.* at 279.

The Eighth Circuit's decision in *Matousek* is squarely on point and compels dismissal of Plaintiffs' excessive fee claims.  Although the plaintiffs there alleged the plan paid its recordkeeper, Merrill Lynch, an "unreasonable" fee ranging "between $326 and $526 per plan participant," the court found the complaint was premised on apples-to-oranges comparisons instead of "meaningful benchmarks."  *Id.*  To gauge whether the fee

---

U.S. Department of Labor, *see id.* ¶¶ 37, 40, 41, 98, and 99.  Accordingly, such disclosures have been "incorporated by reference" in the Amended Complaint and are "integral to the claim[s]" Plaintiffs assert.  *Kraxberger*, 756 F.3d at 1083.  The Eighth Circuit regularly considers such disclosures in addressing similar ERISA fiduciary breach claims.  *See Matousek*, 51 F.4th at 279 (considering Form 5500s and participant fee disclosures); *Davis*, 960 F.3d at 484 n.3 (considering "plan disclosure documents"); *Meiners*, 898 F.3d at 823 (considering fund prospectuses because "those matters are necessarily embraced by the pleadings").

comparisons were meaningful, the court first had "to determine what those services are." *Id*. Taking judicial notice of plan disclosures, the court observed that Merrill Lynch performed both recordkeeping and non-recordkeeping services, the latter of which included compensation for "loan-origination," "individual trades" and "check-service[s]." *Id*. The court also found the fees paid to Merrill Lynch—which included direct compensation and indirect revenue-sharing—encompassed both plan-wide fees paid by all participants and elective-service fees "charged against the account of individual participants" for "participant initiated transactions." *Id*. at 279-80.

Turning to the plaintiffs' comparators, the court found they failed to offer a "like-for-like comparison" on a number of fronts. *Id*. at 279  The fees of some comparator plans covered "only basic recordkeeping services" that did not include the many non-recordkeeping services Merrill Lynch performed. *Id*. at 280.  Other comparators omitted fees for "individualized services" like loans and distributions paid by individual plan participants. *Id*.  Still other comparators included fees paid to "other service providers to the plan" besides Merrill Lynch. *Id*.  The Eighth Circuit also rejected certain comparators because they were not "similarly sized plans" but "smaller plans" with far fewer participants and assets that "might offer fewer services and tools to plan participants." *Id*. at 279-80 (quoting *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022)). As a result, such comparisons did not constitute a "*meaningful* benchmark," and thus "the

plaintiffs ha[d] not created a plausible inference that the decision-making process itself

was flawed." *Id*.[3]

**C.**     **Plaintiffs' Recordkeeping Fee Claims Fail Because They Do Not Allege
A "Meaningful Benchmark."**

Under controlling Eighth Circuit precedent, Plaintiffs fail to plausibly allege a

"meaningful benchmark" that "similar sized plans spend less on the same services."

*Matousek*, 51 F.4th at 279.[4]  Instead, Plaintiffs present a chart purporting to show that

five "comparator" retirement plans paid their respective recordkeepers $14 to $25 per

participant at some unidentified point in time, whereas the U.S. Bank Plan allegedly paid

---

[3] *Matousek* aligns with other recent circuit court decisions.  *See Albert v. Oshkosh*, 47
F.4th 570, 579 (7th Cir. 2022) (affirming dismissal of recordkeeping claims brought by
the same plaintiffs' attorneys, holding the plaintiff "cannot proceed to discovery solely on
the basis that the Plan paid higher recordkeeping fees than a potentially random
assortment of nine other plans from around the country"); *CommonSpirit*, 37 F.4th at
1169 (affirming dismissal of recordkeeping claims because the plaintiffs failed to plead
"that the services that CommonSpirit's fee covers are equivalent to those provided" to the
comparator plans).  While Plaintiffs may invoke the Seventh Circuit's recent decision in
*Hughes v. Northwestern Univ.*, 63 F.4th 61 (7th Cir. Mar. 23, 2023) ("*Hughes II*"), it
does not disturb these holdings.  *Hughes II* applied the "context specific" analysis from
*Albert* to the factual allegations before it, which included the claim that the defendant
imprudently retained multiple recordkeepers and thereby paid duplicative recordkeeping
fees "four to five times" above reasonable ones, which other university plans avoided
through consolidation to a single recordkeeper.  *Id*. at *2, *23.  Here, Plaintiffs'
allegations differ significantly—they do not allege that Defendants had multiple
recordkeepers, failed to consolidate, or paid fees that were "four or five times" more than
their comparator plans' fees.  Plaintiffs' allegations, instead, closely resemble the "naked
fee comparison" dismissed in *Albert*.

[4] *See also Krutchen v. Ricoh USA, Inc.*, No. 22-cv-678, 2022 WL 16950264, at *3 (E.D.
Pa. Nov. 15, 2022) ("*Krutchen I*") ("A meaningful benchmark must include both the
quality and type of recordkeeping services provided by comparator plans to show that
identically situated plans received the same services for less."); *Riley v. Olin Corp.,* No.
4:21-cv-01328-SRC, 2023 WL 371872, at *3 (E.D. Mo. Jan. 24, 2023) (same).

Alight $29 per participant during the putative class period.  *See* AC ¶¶ 98-99.  This "naked fee-to-fee comparison," based on data from undisclosed sources, fails to provide any sort of context regarding the fees and services being compared.  *Guyes v. Nestle USA*, No. 20-CV-1560-WCG-SCD, 2022 WL 18106384, at *4 (W.D. Wis. Nov. 21, 2022) (dismissing recordkeeping claims based on "only a naked fee-to-fee comparison" that failed to identify the "specific services performed by the comparator plans' recordkeepers"), *report and recommendation adopted*, No. 20-CV-1560, 2023 WL 22629 (E.D. Wis. Jan. 3, 2023); *see also Krutchen v. Ricoh USA, Inc*., No. CV 22-678, 2023 WL 3026705, at *2 (E.D. Pa. Apr. 20, 2023) ("*Krutchen II*") ("[W]ithout information as to the type and quality of the services provided, this is insufficient to suggest imprudence . . . because fiduciaries may 'reasonably choos[e] to pay more for higher quality services.'" (citation omitted)).

### 1.   Plaintiffs' Comparator Plans Are Not "Similarly Sized" To The U.S. Bank Plan.

Plaintiffs' own data shows that none of their comparator plans are "similarly sized" to the Plan, as *Matousek* requires.  *See* 51 F.4th at 279 ("[W]e cannot infer imprudence unless *similarly sized plans* spend less on the same services." (emphasis added)).  Instead, Plaintiffs' comparators differ significantly from the Plan in both participants and plan assets, which impacts the scope of plan services required and the price that a plan may be able to negotiate.  *See* AC ¶ 40 (alleging the Plan's size gave it "enormous bargaining power regarding Plan fees and expenses"); *Matousek*, 51 F.4th at 280 (rejecting fee comparison involving "smaller plans" that "might offer fewer services

and tools to plan participants").  The table below reproduces Plaintiffs' chart (AC ¶ 99) with two additional columns (highlighted) showing the differences in participants and assets between the U.S. Bank Plan (in 2021) and each of Plaintiffs' comparator plans:

| Plan | Participants | Difference from U.S. Bank | Assets | Difference from U.S. Bank |
|---|---|---|---|---|
| U.S. Bank 401(k) Savings Plan | 86,195 | n/a | $9,869,704,841 | n/a |
| Leidos, Inc. Retirement Plan | 46,995 | -39,200 | $10,028,148,473 | +$158,443,632 |
| General Dynamics Corporation 401(K) Plan | 48,852 | -37,343 | $9,863,978,096 | -$5,726,745 |
| Fidelity Retirement Savings Plan | 51,049 | -35,146 | $13,250,740,623 | +$3,381,035,782 |
| Fidelity Retirement Savings Plan | 57,658 | -28,537 | $14,730,835,962 | +$4,861,131,121 |
| Fidelity Retirement Savings Plan | 64,113 | -22,082 | $24,332,734,660 | +$14,463,029,819 |
| Deloitte 401K Plan | 98,051 | +11,856 | $9,949,148,795 | +$79,443,954 |
| Lowes 401(K) Plan | 154,402 | +68,207 | $5,619,838,861 | -$4,249,865,980 |

None of Plaintiffs' so-called "comparator plans" are of a "similar" size to the Plan. In terms of participants, the Leidos and General Dynamics plans each have *37,000 fewer* participants than the Plan, whereas the Lowes plan has *68,000 more* participants.  In terms of assets, the Lowes plan has *$4.2 billion fewer* assets than the Plan, while one Fidelity plan has *$14 billion more* in assets.

*Matousek* rejected similar recordkeeping fee comparisons that involved "smaller plans . . . with less than half the number of participants and under a quarter of the total

10

assets" as the plan at issue.  51 F.4th at 280.  Other courts have likewise rejected such

apples-to-oranges comparisons, including the Southern District of Ohio in another case

brought by Plaintiffs' counsel.  *Sigetich v. Kroger Co.*, 21-cv-697, 2023 WL 2431667, at

*4, *8-10  (S.D. Ohio Mar. 9, 2023) (dismissing recordkeeping claims because the

"differences in size" between defendants' plan and the plaintiffs' selected plans "call into

question" whether those plans were "comparable and whether the [defendant's] Plan's

recordkeeping fees were excessive relative to the services rendered"); *see also*

*CommonSpirit*, 37 F.4th at 1169 (affirming dismissal of recordkeeping claims based on

comparisons to "some of the smallest plans on the market, which might offer fewer

services and tools to plan participants"); *Probst v. Eli Lilly & Co.*, No. 22-cv-01106-JMS-

MKK, 2023 WL 1782611, at *11 (S.D. Ind. Feb. 3, 2023) (because "the comparator plans

are not all similar in size to the Plan, nor do they have similar assets . . . [they] call into

question [plaintiff's] characterization of the comparator plans as being of similar sizes

with similar amounts of money under management"); *Mator v. Wesco Distrib., Inc.*, No.

21-CV-00403-MJH, 2022 WL 3566108, at *8 (W.D. Pa. Aug. 18, 2022) (finding

"disparities" in the number of participants and net assets in the comparator plans "raise

serious doubt as to [the] plausibility of how the purported comparator plans are indeed

comparable").  Plaintiffs' excessive recordkeeping fee claims should be dismissed for this

reason alone.

**2.      Plaintiffs Fail To Allege Any Facts About The Services Provided To The U.S. Bank Plan Or Their Comparator Plans.**

In addition, Plaintiffs fail to describe *either* the services Alight provides to the Plan *or* the services provided by the respective recordkeepers to each of their five comparator plans, AC ¶¶ 98-99, making it impossible to determine whether Plaintiffs' purported comparison rests on a "sound basis." *Meiners*, 898 F.3 at 822.  As *Matousek* held, to determine whether "similarly sized plans spend less on the *same services*," the critical step is "to determine *what those services are*."  51 F.4th at 279 (emphases added). The Eighth Circuit addressed that question by carefully analyzing plan disclosures to identify the specific services Merrill Lynch provided to the plan and then determining whether the fees paid by the plaintiffs' comparator plans covered the same services.  The court found that at least one comparator did not—its fees covered only "basic recordkeeping services" far narrower than Merrill Lynch's "suite of administrative services." *Id*. at 279-80 (concluding the proffered comparator "says nothing about the fees for the other services that Merrill Lynch provided, which means it cannot provide a 'sound basis for comparison' for anything else" (quoting *Meiners*, 898 F.3d at 822)).

Here, Plaintiffs fail to take even that first critical step.  Plaintiffs do not allege any facts about the specific services provided by Alight to the Plan *or* the services provided by each of the comparator's recordkeepers to their plans.[5]  Instead, the Amended

---

[5] Plaintiffs claim that, according to the Plan's 2022 participant fee disclosure, "the Plan's RKA [recordkeeping and administrative] fees include '[a]dministrative expenses: Fees paid to the recordkeeper to cover expenses for things like keeping data on participants, communication materials, internet services, and assisting participants with transactions; fees paid to a trustee to manage some operations of the Plan including trading and

Complaint offers only conclusory allegations that the "comparator Plans . . . received materially the same level of quality of services" as the Plan, and recordkeeping services are "fungible among all recordkeepers who provide services to mega plans."  AC ¶¶ 58, 100.  Bald conclusions like this not only fail under *Matousek*, but also under Federal Rule of Civil Procedure 12(b)(6).  *See Schulte*, 997 F.3d at 825.  Indeed, courts have repeatedly dismissed similar recordkeeping claims premised on unsupported and categorical allegations that recordkeeping services are "the same."[6]  Such allegations also "defy common sense" given that "operational complexity and services levels drive

---

holding assets; plus fees paid for legal and accounting services.'"  AC ¶ 48.  But, as Plaintiffs admit, this is ***not a description of Alight's services to the Plan*** because it includes services provided by other third-party providers, such as "accounting services" that Plaintiffs state were provided by Ernst & Young.  *See* ECF No. 1 (Complaint) ¶ 115 n.2; Declaration of Melissa D. Hill, Exhibit 2, at App. 0020.  (All exhibits attached to the Declaration of Melissa D. Hill have been stamped with appendix page numbers, referred hereafter as "App. __.")  Accordingly, this allegation does nothing to fill the gaps in Plaintiffs' proffered fee comparison.

[6] *See, e.g.*, *Krutchen II*, 2023 WL 3026705, at *2 (finding "conclusory statement" that "all recordkeepers provide the same quality of services" is "insufficient to render a comparison meaningful"); *Eli Lilly*, 2023 WL 1782611, at *10 (allegations that "all mega plans receive nearly identical recordkeeping services and that any difference in services was immaterial to the price of those services" were "wholly conclusory and do nothing to identify what specific types of services comparator plans received relative to the Plan"); *Singh v. Deloitte LLP*, No. 21-cv-8458 (JGK), 2023 WL 186679, at *5 (S.D.N.Y. Jan. 13, 2023) (allegation that "[n]early all recordkeepers in the marketplace offer the same range of services" did not provide requisite specificity to support breach of duty of prudence claim); *Laabs v. Faith Techs., Inc.*, No. 20-CV-1534-WCG-SCD, 2022 WL 17418358, at *3 (E.D. Wis. Nov. 9, 2022) (conclusory allegations that recordkeeping fees were excessive relative to services rendered and that defendant's plan "received a standard package of [recordkeeping] services" did not state a claim for breach of duty of prudence), *report and recommendation adopted*, No. 20-1534, 2022 WL 17417583 (E.D. Wis. Dec. 5, 2022); *Mator*, 2022 WL 3566108, at *4-5 (allegations that other recordkeepers "provided identical or similar services of the same quality . . . as those provided by [defendant's provider]" were insufficient to state a fiduciary breach claim).

13

meaningful differentiation in price" between recordkeepers.  *Krutchen II*, 2023 WL
3026705, at *2 (observing the Department of Labor "expressly recommends considering
more than just price" and recognizing that "the quality of [recordkeeper] services" is an
important consideration when selecting a recordkeeper).  Yet, here, Plaintiffs offer only a
"price tag to price tag comparison" devoid of "information as to the type and quality of
the services provided."  *Id*.  This does not pass muster under *Matousek*.  51 F.4th at 279.

In *Matousek*, the Eighth Circuit joined other appellate courts in affirming
dismissal of recordkeeping fees challenges that failed to allege facts regarding the
relevant services.  In *CommonSpirit*, the Sixth Circuit held that the plaintiff "has not
pleaded that the services that CommonSpirit's fee covers are equivalent to those provided
by the plans" identified by the plaintiff.  37 F.4th at 1169.  In *Albert*, the Seventh Circuit
rejected the plaintiffs' recordkeeping fee comparisons because the complaint was "devoid
of allegations as to the quality or type of recordkeeping services the comparator plans
provided."  47 F.4th at 579-80; *see also Forman v. TriHealth, Inc.*, 40 F.4th 443, 449 (6th
Cir. 2022) (affirming dismissal of claims that "plan expenses were almost twice as high
as other comparator plans" because the plaintiffs "never alleged that these fees were high
*in relation to the services that the plan provided*" (emphasis added)).  This Court should
follow suit.

**3.     Even Plaintiffs' Bare Fee Allegations Do Not Support A
         "Meaningful Benchmark."**

Without any factual allegations regarding the services at issue, all that remains of
Plaintiffs' recordkeeping fee claims is a fee-to-fee comparison.  Yet even their fee

allegations are wanting.  To start, Plaintiffs fail to identify the ***relevant year*** in which each of their comparator plans allegedly paid the purported fee.  AC ¶ 99.  It is unclear whether the six plans paid these fees in the same year, whether Plaintiffs are comparing fees from different years, or whether these fees were even paid during the putative class period at all.  And Plaintiffs' chart identifies the "Fidelity Retirement Savings Plan" ***three times***, each time with a different number of participants, assets, and per-participant fees. *Id*.  It is unclear whether Plaintiffs allege the existence of three different Fidelity plans or one plan (and, if the same plan, why it is included three times).  Lacking even this basic context, on the face of the Amended Complaint, it is impossible to determine whether Plaintiffs offer the meaningful benchmark *Matousek* requires.

Plaintiffs likewise say nothing about the different ***types of fees*** paid to Alight and the comparators' recordkeepers, which further undermines any meaningful comparison. Plaintiffs elsewhere allege the Plan charged participants both plan-wide fees and "additional fees based on the conduct of individual participants" for elective services like loan processing and brokerage accounts.  AC ¶¶ 47-48, 53-54.  They also allege the Plan paid Alight other fees directly, including transaction fees, ESOP fees, fees for service, and terminated maintenance fees.  *Id*. ¶¶ 55-56.  But the Amended Complaint does not allege which of these different fees were included in their calculations of the Plan's alleged per-participant fee.  Similarly, while alleging their five comparator plans paid lower per-participant fees, they do not identify which fees are included in those calculations, either.  *Id*. ¶¶ 98-99.  Again, it is impossible to determine whether Plaintiffs' fee comparisons include the same kinds of fees and constitute a "like-to-like"

comparison. *Matousek,* 51 F.4th at 279-80 (rejecting claim where the plaintiffs failed to allege whether fees included elective charges "against the account of individual participants rather than on a plan-wide basis," such as loan origination or self-directed brokerage window fees).

Moreover, while Plaintiffs allege the Plan paid "both direct and indirect" compensation, AC ¶ 68, they do not allege whether the per-participant fees they calculated for the Plan and their proffered comparators include only direct compensation, only indirect compensation, or both, *see id.* ¶¶ 98-99.  *All* of the comparator plans paid indirect compensation to their recordkeepers, although the amount of that indirect compensation is not disclosed in the documents on which Plaintiffs rely.[7]  Thus, Plaintiffs' fee calculations cannot possibly account for the *entire amount* of compensation received by the recordkeepers so as to provide the requisite apples-to-apples comparison. *See Fritton v. Taylor*, No. 22-cv-00415 (ECT/TNL), 2022 WL 17584416, at *7 (D. Minn. Dec. 12, 2022) (rejecting recordkeeping fee comparison that did not consistently include indirect recordkeeping fees); *Anderson v. Coca-Cola Bottlers' Ass'n*, No. 21-2054-JWL, 2022 WL 951218, at *11 (D. Kan. Mar. 30, 2022) (reasonableness of plan recordkeeping

---

[7] This information is provided on each plan's Form 5500, Schedule C, Part I, lines 1 and 2, for the specific year Plaintiffs cite in their fee chart.  *See* App. 0066 (Leidos (2021)); App. 0103 (General Dynamics (2021)); App. 0144 (Fidelity (2014)); App. 0387 (Fidelity (2016)); App. 0752 (Fidelity (2020)); App. 0870 (Deloitte (2021)); App. 0913 (Lowes (2018)).

fees "may only be judged in the context of considering the total fees paid, including fees

paid by indirect methods").[8]

### 4.   Judicially Noticeable Information Shows Plaintiffs' Fee Comparisons Are Implausible And Fail To Allege A Meaningful Benchmark.

Further, publicly available information demonstrates that Plaintiffs' comparisons

are implausible and do not constitute a meaningful benchmark.

***First***, the Amended Complaint claims the Plan's $29 per-participant fee comes

from the Plan's 2022 participant fee disclosure. AC ¶ 98.  Although the disclosure states

participants pay a $2.40 monthly fee (or $28.80 per year) for Plan "administrative

expenses," *see* App. 0001, this represents only the ***plan-wide participant fee***—it does not

include the separate ***individual fees*** that specific participants pay for elective Plan

services like loans, *see* App. 0001-0002.  Also, that same fee disclosure states the annual

$29 fee covers "the Plan's administrative expenses," which are defined as:

> Fees paid to the ***recordkeeper*** to cover expenses for things like keeping
> data on participants, communication materials, internet services, and
> assisting participants with transactions; fees paid to ***a trustee*** to manage

---

[8] *See also Cunningham v. USI Ins. Servs., LLC,* No. 21 Civ. 1819 (NSR), 2022 WL 889164, at *5 (S.D.N.Y. Mar. 25, 2022) ("Plaintiff fails to specify how she calculated the Plan's indirect fees because they are not available by themselves on the Form 5500 filings. . . . In fact, nowhere in the Complaint does Plaintiff provide any figures, estimates, or formulas from which the Court could reasonably infer [how] Plaintiff obtained such results."); *Gonzalez v. Northwell Health, Inc.*, No. 20-CV-3256 (RPK) (RLM), 2022 WL 4639673, at *10 (E.D.N.Y. Sept. 30, 2022) (because the plaintiff's calculations did not include indirect compensation, they provided "little insight into whether total recordkeeping fees—*i.e.*, accounting for any indirect payments—paid by . . . plan participants are higher or lower than the *total* recordkeeping fees paid by plaintiff and other Plan participants").

some operations of the Plan including trading and holding assets; plus fees paid for ***legal and accounting services.***

App. 0007 (emphases added).  But ***different entities*** provided these Plan services and so received a portion of the $29 annual fee.  *See, e.g.,* App. 0018-0019 (Ernst & Young provided Plan accounting services and U.S. Bank, N.A., provided Plan trustee services).  Therefore, not all of the $29 annual fee is paid to Alight for recordkeeping services.  Despite this, Plaintiffs compare this $29 fee to the fees paid by other plans allegedly just for recordkeeping.  This is not an apples-to-apples comparison.[9]  *See Matousek*, 51 F.4th at 280 (rejecting comparators that included fees "received by other service providers to the plan").

 ***Second***, Plaintiffs' allegations relating to the Fidelity plan are based on a discovery stipulation from a lawsuit in which Fidelity was alleged to have caused its own retirement plan to pay excessive recordkeeping fees.[10]  App. 0941-0948; *see also Moitoso*

---

[9] Indeed, the very premise of Plaintiffs fee comparison is that recordkeeping fees are appropriately calculated and compared on a *per-participant* basis, assuming the number of participants determines the recordkeeping fee.  AC ¶ 99.  But the very report Plaintiffs cite in the Amended Complaint explain this is incorrect.  As Morningstar's Center for Retirement & Policy Studies explains, "Plan *assets* drive plan costs lower, not increased number of participants.  In fact, . . . plans with greater number of participants are actually associated with higher costs rather than lower costs, holding assets in the plan constant."  *See* Center for Retirement and Policy Studies, *Retirement Plan Landscape Report* (March 2022) at 21 (emphasis added) (cited in AC ¶ 36).  According to Plaintiffs' source, it is more accurate to analyze recordkeeping fees as a percentage of total plan assets.  When doing so here, the Plan's alleged recordkeeping fees constitute only 0.025% of its assets—which is *lower* than the amount paid by the Lowes plan at 0.052%.  Thus, *Plaintiffs' own comparator* shows the Plan's fees are not "excessive."

[10] Despite holding out these comparator plans as paying "reasonable" and "prudent" recordkeeping fees, four of these plans have been sued for failing to prudently monitor their fees and investment options.  *See* Compl., *Moitoso v. FMR LLC*, No. 1:18-cv-12122 (D. Mass. 2018) ("*Moitoso* Complaint"), ECF No. 1 ¶¶ 70-72 (alleging fiduciaries of the

Complaint ¶¶ 70-72.  In the lawsuit, Fidelity stipulated to certain facts "for purposes of

[that] litigation only" to satisfy its discovery obligations to plaintiffs.  App. 0941.  But the

stipulation does not state the Fidelity plan *actually paid* an annual $14 to $21 per-

participant recordkeeping fee; it states only that these amounts reflected "the *value* of the

recordkeeping services" that Fidelity provided to its own plan at the time.  App. 0943.

(emphasis added).  Fidelity has since made clear that the stipulation was entered into "for

the limited purpose of resolving a discovery dispute" and "certainly does not reflect the

value of the recordkeeping services that Fidelity provides to *different plans* pursuant to

*different recordkeeping contracts* for a *different set of services*."  App. 0951 (emphases in

original).  Accordingly, courts have rejected fee comparisons based on this same Fidelity

stipulation.  *See Wehner v. Genentech, Inc.*, No. 20-cv-06894-WHO, 2021 WL 507599,

at *6 (N.D. Cal. Feb. 9, 2021) (refusing to draw any inference from the *Moitoso*

discovery stipulation); *Johnson v. PNC Fin. Servs. Grp., Inc.*, No. 2:22-CV-01493-CCW,

2021 WL 3417843, at *4 (W.D. Pa. Aug. 3, 2021) (same).  The Court should do the same

here.

---

Fidelity plan allowed participant to pay unreasonable recordkeeping fees); *Will v. Gen.
Dynamics Corp.*, No. 3:06-cv-00698-GPM -CJP (S.D. Ill. 2006), ECF No. 116 ¶¶ 55-62
(alleging fiduciaries of the General Dynamics plan allowed it to pay unreasonable fees
and expenses); *Singh v. Deloitte LLP*, No. 21-cv-084558 (S.D.N.Y. 2021), ECF No. 1 ¶¶
58-73 (alleging fiduciaries of Deloitte plan failed to adequately monitor and control
plan's recordkeeping fees, which were allegedly $65 per participant in 2019); *Reetz v.
Lowes*, No. 5:18-cv-00075-KDB-DCK (W.D.N.C. 2020), ECF No. 1 ¶¶ 73-85 (alleging
fiduciaries failed to prudently monitor plan investments).  This casts further doubt on
whether Plaintiffs have plausibly pled a meaningful benchmark.

In sum, Plaintiffs' recordkeeping fee claims cannot withstand dismissal.[11]

**D.      Plaintiffs' Managed Account Fee Allegations Fail To State A Claim.**

Plaintiffs' second claim—that the fees for the "managed account services" offered by AFA through the Professional Management program were "excessive"—also fails as a matter of law.  AC ¶¶ 120-39.

As a threshold matter, the Professional Management service is voluntary, and Plan participants are free to choose whether to use this asset allocation service.  *Id*. ¶ 69; App. 0001-0002.[12]  Simply offering an elective service does not support a claim for breach of fiduciary duty.  *See Loomis v. Exelon Corp*., 658 F.3d 667, 673-74 (7th Cir. 2011); *Rosen v. Prudential Ret. Ins. & Annuity Co*., No. 3:15-cv-1839 (VAB), 2016 WL 7494320, at *16 (D. Conn. Dec. 30, 2016) (dismissing claim that the defendant imprudently offered asset allocation service, noting "[i]t is undisputed that the [asset allocation] program was optional for Plan participants"), *aff'd*, 718 F. App'x 3 (2d Cir. 2017).[13]

---

[11] In addition, Plaintiffs make the speculative and wholly conclusory allegation that "Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers," AC ¶ 96, which the Court need not accept as true for purposes of a motion to dismiss.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Schulte*, 997 F.3d at 825.  Courts have dismissed allegations that a fiduciary breached its duties by failing "to regularly solicit quotes or competitive bids from service providers."  *Albert*, 47 F.4th at 579; *see also, e.g.*, *Riley v. Olin Corp.*, No. 4:31-cv-01328-SRC, 2022 WL 2208953, at *5 (E.D. Mo. June 21, 2022) ("[T]he allegation that the Plan fiduciaries were required to solicit competitive bids on a regular basis has no legal foundation." (quoting *White v. Chevron Corp.*, No. 16-cv-793-PJH, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016))).

[12] Plaintiffs concede the Plan's annual fee disclosures described this optional service and its fee.  *See* AC ¶ 126; App. 0002.

[13] Plaintiffs, for instance, allege that Defendants acted imprudently by offering AFA's managed account services when comparable services were available for less in the form

Further, Plaintiffs yet again fail to allege a "meaningful benchmark" for the

Professional Management service. *Matousek*, 51 F.4th at 279-80. Plaintiffs purport to

compare it to the managed account services offered by six other plans, alleging the

comparators' rates were "significantly lesser" than those paid by the Plan. AC ¶¶ 126-28.

Plaintiffs' allegations are woefully deficient.

To start, the Amended Complaint wholly lacks even the most basic information

regarding Plaintiffs' managed account service fee comparison. Plaintiffs fail to identify

**the service provider** allegedly providing the managed account services to each

comparator plan (further undermining the claim services are "similar"), fail to describe

**the actual services provided by AFA** through the Professional Management program, and

fail to describe the **actual services offered to any of the comparator plans**.

Instead, Plaintiffs recite a familiar conclusory refrain: "[a]ll the comparator Plans

provide the materially same managed account services." AC ¶ 129. The report Plaintiffs

cite in the Amended Complaint contradicts this allegation. *See id*. ¶¶ 71, 133 (citing The

United States Government Accountability Office, 401(K) PLANS: IMPROVEMENTS CAN

BE MADE TO BETTER PROTECT PARTICIPANTS IN MANAGED ACCOUNTS (June 2014), at

32, https://www.gao.gov/assets/670/664391.pdf ("Report")). The Report emphasized the

wide range of managed account services available in the market, explaining:

> The eight providers in our case studies use different
> investment options, employ varying strategies to develop and

---

of target date funds. AC ¶¶ 131-33. Not only is this allegation purely conclusory—
Plaintiffs cite no authority concluding that managed account services are the same as a
target date fund—but the Plan *did* offer a suite of Vanguard target date funds, which both
Plaintiffs invested in. *See id*. ¶¶ 29, 32.

> adjust asset allocations for participants, incorporate varying
> types and amounts of participant information, and rebalance
> participant accounts at different intervals.  As a result,
> participants with similar characteristics in different plans may
> have differing experiences.

Report at 14.[14]  Despite this acknowledgment in the GAO Report, which Plaintiffs

themselves rely on, the Amended Complaint lacks *any factual allegations regarding the*

*managed account services provided to the Plan or Plaintiffs' comparator plans*,

warranting dismissal.  *See Glick*, 2022 WL 16927749, at *4 (dismissing managed account

fee claims because the complaint did "not describe the *specific services* provided" or

"contain *any* factual allegations showing that the plans are in fact similarly situated");

*Laabs*, 2022 WL 17418358, at *4-5 (dismissing excessive managed account fee claim

that alleged "low-cost" alternatives were available but failed to provide "more detailed

allegations" to show "plaintiff put forward an appropriate comparator—that is a

'meaningful benchmark'"); *see also Matousek*, 51 F.4th at 279 (a plaintiff must "identify

similar plans offering the *same services* for less" (emphasis added)).[15]

---

[14] Courts have cited this language when rejecting similar conclusory allegations from
Plaintiffs' own attorneys.  *See Glick v. ThedaCare*, No. 20-CV-1236, 2022 WL 16927749
at *4 (E.D. Wis. Oct. 27, 2022) (dismissing excessive managed account fee claims and
quoting the Report when recognizing that, "while the basic service may generally be the
same, each managed account service provider may go about offering that service in a
different manner.  And the variance in that process may, in some cases, explain the
difference in fees charged.").

[15] Plaintiffs also offer various conclusory allegations that other service providers offered
"[m]aterially identical managed account services" as AFA.  *See, e.g.*, AC ¶¶ 124, 130.
Such unadorned allegations do not suffice to state a plausible claim.  *See Schulte*, 997
F.3d at 825; *Krutchen II*, 2023 WL 3026705, at *2; *Eli Lilly*, 2023 WL 1782611, at *10;
*Deloitte*, 2023 WL 186679, at *5; *Mator*, 2022 WL 3566108, at *4-5.

In addition, Plaintiffs stumble by failing, once again, to plausibly allege their comparator plans are "similarly sized plans" to the U.S. Bank Plan, omitting basic information such as the number of participants and total assets even though this information is readily available from public sources.  AC ¶¶ 126-27.  They allege no facts about the size of any of their six comparator plans while simultaneously alleging that plan size is a driver of managed account fees.  *See id.* ¶ 131 ("Defendants should have been able to use its massive size and enormous leverage to solicit much lower managed account service fees from AFA or other managed account service providers.").  The Amended Complaint falls short of *Matousek*'s standard.  51 F.4th at 279 ("Even if the fees here look high, we cannot infer imprudence unless *similarly sized plans* spend less on the same services." (emphasis added)); *see also Glick*, 2022 WL 16927749, at *4 (dismissing allegations of excessive managed account fees when, as here, the plaintiffs' fee comparison table "doesn't even list the number of participants or asset size of the comparator plans").

Judicially noticeable documents show that Plaintiffs' comparator plans are starkly different than the U.S. Bank Plan in terms of participants and assets:[16]

---

[16] The table below reflects data from the most recent Form 5500 filed by the U.S. Bank Plan, which was in 2021.  Plaintiffs' chart refers to the "Caterpillar Sponsored 401(k) Plans," which includes the Caterpillar 401(k) Retirement Plan and the Caterpillar 401(k) Savings Plan.  The number of active participants is provided on each plan's Form 5500, Part II, line 6g.  *See* App. 0010 (U.S. Bank); App. 0964 (Verso); App. 1014 (AGFA); App. 1049 (Caterpillar Retirement Plan); App. 1095 (Caterpillar Savings Plan); App. 1141 (Citigroup); App. 1278 (JC Penney); App. 1361 (Comcast).  The net assets is provided on each plan's Form 5500, Schedule H (Financial Information), Part I, line 1*l* (net assets at end of year).  *See* App. 0033 (U.S. Bank); App. 0985 (Verso); App. 1027

| Plans | Year | Active Participants | Difference from U.S. Bank Plan Participants (2021) | Net Assets | Difference from U.S. Bank Plan Assets (2021) |
|---|---|---|---|---|---|
| **U.S. Bank Plan** | **2021** | **86,195** | **n/a** | **$9,869,704,841** | **n/a** |
| Verso Retirement Savings Plan | 2021 | 2,210 | -83,985 | $346,192,939 | -$9,523,511,902 |
| AGFA Healthcare Corp. Employee Savings Plan | 2018 | 763 | -85,432 | $153,973,027 | -$9,715,731,814 |
| Caterpillar Sponsored 401(k) Plans | 2016 | 47,631 | -38,564 | $8,815,634,608 | -$1,054,070,233 |
| Citi Retirement Savings Plan | 2015 | 139,947 | +53,752 | $11,436,037,587 | +$1,566,332,746 |
| JC Penney 401(k) Savings Plan | 2015 | 85,980 | -215 | $2,699,558,000 | -$7,170,146,841 |
| Comcast Corp. Retirement Investment Plan | 2019 | 137,035 | +50,840 | $12,633,875,411 | +$2,764,170,570 |

The differences between the Plan and Plaintiffs' so-called "comparators" are stark.
The AGFA plan, for instance, has *less than 0.9%* of the participants of the Plan, whereas
the Citi plan has over *53,000 more* participants than the Plan. Likewise, in terms of net
assets, the Verso plan has *less than 4%* of the assets of the U.S. Bank Plan and the JC
Penney plan has *$7.1 billion less* in assets, while the Comcast plan has *$2.7 billion more*
in assets. Such comparisons do not provide a "meaningful" fee benchmark. *See*

(AGFA); App. 1065 (Caterpillar Retirement Plan); App. 1111 (Caterpillar Savings Plan);
App. 1174 (Citigroup); App. 1295 (JC Penney); App. 1374 (Comcast).

*Matousek*, 51 F.4th at 280 (rejecting fee comparison involving "smaller plans" that "might offer fewer services and tools to plan participants").[17]

Examining the allegations that Plaintiffs *do* proffer confirms the Amended Complaint fails to allege a "like-for-like comparison." *Matousek*, 51 F.4th at 279. Plaintiffs claim that, like the U.S. Bank Plan, their comparators reduce their managed account service fees progressively across three tiers based on the assets under management. AC ¶¶ 126-27. They further allege that AFA's managed account fees were 0.60% for the first $100,000 under management, then 0.45% for the next $150,000, and 0.30% for all assets over $250,000. *Id*. ¶ 126. But Plaintiffs do not state how any of their comparator plans define their fee tiers—referring only to "1st Tier," "2nd Tier," "3rd Tier" without explaining the amount of assets corresponding to each tier for each plan and provider. *Id*. ¶ 127. In fact, for the Verso Retirement Savings Plan, the Amended Complaint states the fees for the second and third tiers are "N/A," suggesting the "1st Tier" encompasses the other tiers. *Id*. As a result, it is impossible to tell whether the same participant would pay more under the Plan or not.

---

[17] Because many of their comparator plans are only a fraction as large as the U.S. Bank Plan, Plaintiffs assert their size is irrelevant. AC ¶ 131. But that argument is foreclosed by *Matousek*, where the Eighth Circuit found the plaintiffs' comparators did not constitute meaningful benchmarks precisely because they were "smaller plans . . . with less than half the number of participants and under a quarter of the total assets." 51 F.4th at 280. The court quoted the Sixth Circuit's decision in *CommonSpirit*, which also rejected a recordkeeping fees comparison involving "some of the smallest plans on the market," noting that such plans "might offer fewer services and tools to plan participants" in comparison with the services offered to a larger and more complex plan. *Id*. (citing *CommonSpirit*, 37 F.4th at 1169); *see also McCaffree Fin. Corp. v. ADP, Inc.*, No. 20-5492 (ES) (JRA), 2023 WL 2728787, at *14 (D.N.J. Mar. 31, 2023) (dismissing excessive fee claims based on comparisons with "much smaller plans").

Plaintiffs' fee allegations suffer from another problem.  Rather than comparing the fees allegedly paid by the comparator plans in the same year, the fees haphazardly span an eight-year period from 2015 to 2021, with *half* of the comparator fees from before the start of the 2017 putative class period—a period in which Plaintiffs do not allege any fiduciary breach occurred and, even if they did, such claims would be barred by ERISA's six-year statute of repose.  *See* 29 U.S.C. § 1113(1).  Plaintiffs thus fail to allege the "sound" and "meaningful benchmark" required by *Matousek*, and the Court cannot plausibly infer, on these flawed and deficient allegations, that Defendants breached their fiduciary duties in offering the Professional Management service.

### E.     Plaintiffs' Claim For Failure To Monitor Other Plan Fiduciaries Must Be Dismissed.

Finally, Plaintiffs claim that certain Defendants breached their duty to monitor other Plan fiduciaries.  *See* AC ¶¶ 174-80.  This claim fails because it is a wholly derivative cause of action that rises and falls with Plaintiffs' principal claims for fiduciary breach, which fails for the reasons outlined above.  *See Albert*, 47 F.4th at 583.

## IV.    CONCLUSION

For the reasons above, and given that Plaintiffs have now had two bites at the apple, the Court should dismiss Plaintiffs' Amended Complaint in its entirety with prejudice.

Date: May 2, 2023                              */s/ Melissa D. Hill*
                                              Melissa D. Hill (pro hac vice)
                                              Christopher Diffee (pro hac vice)
                                              William Engelhart (pro hac vice)
                                              Morgan, Lewis & Bockius LLP
                                              101 Park Avenue

New York, NY 10178
212-309-6000
212-309-6001 (fax)
melissa.hill@morganlewis.com
christopher.diffee@morganlewis.com
william.engelhart@morganlewis.com

Daniel J. Supalla (#0387064)
Maria S. Agostinho Campbell (#0401778)
Nilan Johnson Lewis PA
250 Marquette Avenue South, Suite 800
Minneapolis, MN 55401
612-305-7500
612-305-7501 (fax)
dsupalla@nilanjohnson.com
MACampbell@nilanjohnson.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF WORD COUNT COMPLIANCE</u>

I, Melissa D. Hill, certify that **Memorandum of Law in Support of Defendant's Motion to Dismiss Plaintiffs' Amended Complaint** complies with the word limits in Local Rule 7.1(f) and with the type-size limit of Local Rule 7.1(h).

I further certify that, in preparation of this Memorandum, I used Microsoft Word, and that this word processing program has been applied specifically to include all text, including headings, footnotes, and quotations, in the following word count.  I further certify that the aforementioned Memorandum contains 7,562 words.

Dated: May 2, 2023                    Respectfully submitted,

By: */s/ Melissa D. Hill*