UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| ANA L. DIONICIO and ALEJANDRO M. WESAW, individually, and as representatives of a Class of Participants and Beneficiaries of the U.S. Bank 401(k) Savings Plan,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. BANCORP, the BOARD OF DIRECTORS OF U.S. BANCORP, U.S. BANCORP'S BENEFITS ADMINISTRATION COMMITTEE, and U.S. BANCORP'S INVESTMENT COMMITTEE,<br><br>Defendants. | Case No. 23-CV-0026 (PJS/DLM)<br><br>ORDER |

Amy R. Mason, MILLER & STEVENS; Paul M. Secunda, WALCHESKE & LUZI LLC, for plaintiffs.

Christopher M. Diffee and Melissa D. Hill, MORGAN, LEWIS, & BOCKIUS LLP; Daniel J. Supalla and Maria Campbell, NILAN JOHNSON LEWIS, for defendants.

Plaintiffs Ana L. Dionicio and Alejandro M. Wesaw bring this putative class action under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, against U.S. Bancorp ("U.S. Bank"), its Board of Directors ("Board"), and two of its benefits committees ("Committees"). Plaintiffs are former employees of U.S. Bank and participants in its 401(k) Savings Plan. The matter is before

the Court on defendants' motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6). For the reasons that follow, defendants' motion is granted in part and denied in part.

I. BACKGROUND

Plaintiffs are participants in and beneficiaries of the U.S. Bank 401(k) Savings Plan (the "Plan"). Am. Compl. ¶ 1, ECF No. 28. The Plan is a defined-contribution pension plan that provides, in the words of ERISA, "an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses . . . ." 29 U.S.C. § 1002(34). The Plan is huge. As of 2021, the Plan had more than 86,000 participants and more than $9.85 billion in assets. Am. Compl. ¶¶ 40–41. Its size makes the Plan larger than 99.99% of other defined-contribution plans. *Id.* ¶ 41.

U.S. Bank is the Plan's sponsor. *Id.* ¶ 15. Under ERISA, each defendant is a fiduciary of the Plan and owes a duty of prudence to the Plan, its participants, and its beneficiaries. *Id.* ¶¶ 9, 15; *see also* 29 U.S.C. §§ 1002(21)(A), 1104(a)(1)(B). Plaintiffs allege that defendants have breached their fiduciary duties in four ways. Am. Compl. ¶ 5.

First, plaintiffs allege that defendants breached the duty of prudence by incurring excessive recordkeeping and administrative fees. *Id.* ¶ 6. Pension plans often

hire national retirement plan service providers ("recordkeepers") to perform recordkeeping and administrative ("RKA") services. *Id.* ¶ 43. For sufficiently large plans—known as "mega plans"—recordkeepers "bundle" standard RKA services into a single package that will meet the needs of any mega plan, regardless of which particular services within the package an individual mega plan chooses to use. *Id.* ¶¶ 43, 47. Such bundled RKA services are fungible commodities; the only real difference among the packages offered by various national providers is price. *Id.* ¶¶ 44, 50–52, 101. In addition to bundled RKA services, all national providers offer "a la carte" and "ad hoc" services that are dependent on participant conduct and individual transactions. *Id.* ¶¶ 53–56.

The total cost of RKA services equals the sum of bundled RKA, a la carte, and ad hoc services fees. *Id.* ¶ 57. Differences in fees for a la carte and ad hoc services among recordkeepers are negligible, however, so the price for bundled RKA services is the primary focus of any comparison of the prices of national providers. *Id.* ¶ 58–61. Because bundled RKA services are fungible commodities, the market for them is highly competitive, with recordkeepers aggressively bidding against each other when offering their services to mega plans. *Id.* ¶¶ 51–52.

U.S. Bank employed a recordkeeper to provide RKA services to the Plan. *Id.* ¶¶ 6, 48. The Plan paid an average price-per-participant of $29 per year for the

services of that recordkeeper. *Id.* ¶ 98. Plaintiffs assert that those prices were 52% higher than fees paid by comparable defined-contribution plans, which fees averaged $19 per year for each participant. *Id.* ¶¶ 99, 105–06. Plaintiffs allege that the fact that the Plan so badly overpaid for RKA services means that defendants did not use a reasonable process in selecting a recordkeeper, in breach of their duty of prudence. *Id.* ¶¶ 119, 160.

Second, plaintiffs allege that defendants breached their duty of prudence by incurring excessive fees for managed-account services. *Id.* ¶ 7. Managed-account services allow a participant to choose an investment strategy from a fixed range of options, and the participant's account is rebalanced and reallocated over time pursuant to industry standards. *Id.* ¶¶ 70–71, 123. Participants who choose managed-account services are charged an annual fee based on the size of their accounts, regardless of investment strategy. *Id.* ¶¶ 72, 75. Participants can choose whether or not to opt into managed-account services, but, if they do opt in, they are not able to choose either the provider or the fee rate. *Id.* ¶ 76. Instead, a pension plan contracts with a managed-account-services provider to serve plan participants at set fees. *Id.*

U.S. Bank hired such a provider to supply managed-account services to Plan participants. *Id.* ¶¶ 69, 72. The Plan's managed-account-services provider charges a three-tiered fee rate based on the amount of account assets: 0.6% for $100,000 or less;

0.45% for $100,000 to $250,000; and 0.3% for $250,000 or more. *Id.* ¶ 72. Plaintiffs assert that these fees are excessive because (1) low-cost target-date funds could achieve the same results, *id.* ¶¶ 131–34, and (2) other defined-contribution plans paid materially lower fee rates for materially identical services, *id.* ¶¶ 127, 135.

Finally, plaintiffs allege two breaches of fiduciary duty against U.S. Bank and its Board for failing to monitor the Committees responsible for overseeing fees for the Plan's RKA and managed-account services. *Id.* ¶ 8. Plaintiffs bring suit both in their individual capacity and as representatives of a putative class of participants and beneficiaries of the Plan, with the proposed class period to begin in January 2017. *Id.* ¶ 141.

## II. ANALYSIS

### A. Standard of Review

In reviewing a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Perez v. Does 1–10*, 931 F.3d 641, 646 (8th Cir. 2019). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570.

Ordinarily, if the parties present, and the court considers, matters outside of the pleadings, a Rule 12(b)(6) motion must be treated as a motion for summary judgment. Fed. R. Civ. P. 12(d). But the court may consider materials that are necessarily embraced by the complaint, as well as any exhibits attached to the complaint, without converting the motion into one for summary judgment. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).

### B. Duty of Prudence

ERISA imposes a duty of prudence on fiduciaries of covered pension plans. *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 739 (2022). This duty requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* (quoting 29 U.S.C. § 1104(a)(1)(B)). This prudent-person standard is an objective, context-specific inquiry that focuses on "the process by which [a fiduciary] makes its decisions rather than the results of those decisions." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) (citations omitted); *Hughes*, 142 S. Ct. at 740 (ERISA's duty of prudence requires a "context-specific inquiry").

Because ERISA plaintiffs often lack information about a fiduciary's decision-making process, *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018), plaintiffs

typically satisfy "the pleading bar by alleging enough facts to '*infer* . . . that the process was flawed,'" *Matousek v. MidAm. Energy Co.*, 51 F.4th 274, 278 (8th Cir. 2022) (quoting *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 482–83 (8th Cir. 2020) (emphasis added)). For claims involving excessive fees, "the way to plausibly plead a claim of this type is to identify similar plans offering the same services for less." *Id.* at 279. Put differently, plaintiffs must provide a "meaningful benchmark" that allows "a sound basis for comparison." *Id.* at 278 (quoting *Davis*, 960 F.3d at 484).

1. Recordkeeping Fees

In support of their claim regarding excessive recordkeeping fees, plaintiffs identify seven[1] comparator plans. Am. Compl. ¶ 99. Using data from § 404(a)(5) participant fee disclosures,[2] plaintiffs allege that, during the class period, each of the comparator plans paid less for recordkeeping than did the Plan. *Id.* ¶¶ 107–11.

Defendants argue that the plans identified by plaintiffs are not sufficiently similar to the Plan to serve as meaningful comparators. Defs.' Mem. 9, ECF No. 34. Canvassing the proffered comparators, defendants contend that each has too many or too few participants, or too many or too few assets. *Id.* at 10. Defendants rely on

---

[1]Three of the plans share the same name, but have different numbers of participants, total assets, and RKA fees, so it is unclear if these are different years of the same plan or different plans entirely.

[2]Plan fiduciaries must disclose to participants the fees and expenses of participant-directed individual account plans. *See* 29 C.F.R. § 2550.404a-5(b).

*Matousek*, in which the Eighth Circuit faulted the plaintiffs for relying on "smaller plans . . . with less than half the number of participants and under a quarter of the total assets." 51 F.4th at 280 (citing *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022)). Likewise, in *CommonSpirit*, the Sixth Circuit rejected the plaintiff's comparison of the recordkeeping fees of a plan with more than 100,000 participants and $3 billion in assets to the recordkeeping fees of "some of the smallest plans on the market." 37 F.4th at 1163, 1169.

Defendants' arguments are unavailing for a number of reasons. To begin with, plans need not be numerically identical to be similarly sized, as "there is no one-size-fits-all approach" for determining whether a particular plan provides a meaningful benchmark. *Matousek*, 51 F.4th at 280–81. Plaintiffs allege that the Plan has more participants and more assets than 99.99% of other defined-contribution plans. Am. Compl. ¶ 41. That makes it easy for defendants to complain about potential comparators. Even if a comparator has similar total assets, defendants will complain that it has too many or too few participants, and even if a comparator has similar total participants, defendants will complain that it has too many or too few assets. Indeed, in this case defendants have complained of a difference in participants of less than 14% and a difference in assets of less than 1%. *See* Defs.' Mem. 10. Under defendants'

approach, plaintiffs suing exceptionally large or exceptionally small plans would face a nearly insurmountable pleading hurdles.

For their part, plaintiffs assert that, as a general matter, other mega plans are viable comparators to the Plan. The amended complaint defines mega plans as plans with more than $500 million in assets, citing an industry report in support of that definition. Am. Compl. ¶ 36. All of plaintiffs' comparator plans have more than $5 billion in assets and at least 46,000 participants. *Id.* ¶ 99. Unlike the plaintiffs in *Matousek* and *CommonSpirit*, plaintiffs in this case have not offered as comparators plans that have little in common with the defendant plan, but rather have provided relatively close matches given the Plan's exceptional size. Thus, under the circumstances of this case, the Court finds that comparing the Plan with the mega plans identified by plaintiffs is a "like-for-like comparison" that provides a "meaningful benchmark" for assessing the Plan's recordkeeping fees. *Matousek*, 51 F.4th at 279.

Defendants next complain that plaintiffs fail to identify the particular services used by each plan, foreclosing apple-to-apple comparisons. Defs.' Mem. 12. In *Matousek*, for example, a plaintiff who was complaining of excessive fees compared the total compensation paid to his plan's recordkeeper (as reported on his plan's Form 5500[3]) to industry-wide averages for "the typical suite of administrative services" (as

---

[3]ERISA plan administrators must file Form 5500 "Annual Return/Report of
(continued...)

reported on § 404(a)(5) forms). *Matousek*, 51 F.4th at 279–80. The court found that the comparison was not meaningful because the plaintiff was comparing total compensation—which included payment for all sorts of services beyond "the typical suite of administrative services"—to compensation for just RKA services. *Id.*

Here, unlike in *Matousek*, plaintiffs do not mention the total compensation paid to the Plan's recordkeeper or cite Form 5500. Instead, plaintiffs rely solely on the § 404(a)(5) participant-disclosure forms to calculate the costs of RKA services for both the Plan and the comparator plans. In fact, defendants' reliance on *Matousek* is doubly misplaced because *Matousek* strongly suggests that a comparison of payments made for "basic recordkeeping services" (as disclosed by § 404(a)(5) forms) by two similarly-sized plans could provide the basis of a plausible claim for relief. *See id.*

Plaintiffs make just such a comparison, bolstered by additional allegations regarding the fungibility and commodification of RKA services. Plaintiffs identify the particular types of services included in the "typical suite of administrative services" and allege that such services are bundled into a fungible commodity sold to mega plans in a competitive market. Am. Compl. ¶¶ 43, 47, 50–52, 101. Further, plaintiffs allege that numerous national recordkeepers offer bundled RKA services that are materially indistinguishable with respect to their quality. *Id.* ¶¶ 44–45. These allegations make it

---

[3](...continued)
Employee Benefit Plan" with the Department of Labor. *See* 29 C.F.R. § 2520.103-1(b)(1).

unnecessary to compare individual services to individual services, because all recordkeepers provide the same bundled services, and the total price of the bundle remains the same no matter which of the individual services within the bundle a mega plan chooses to use. *Cf. Hughes v. Northwestern Univ.*, 63 F.4th 615, 632 (7th Cir. 2023) ("*Hughes II*") (finding that plaintiffs stated a claim for breach of fiduciary duty based on allegations that "recordkeeping services are fungible and the market for them is highly competitive" because fungibility satisfied the need to allege "the quality or type of recordkeeping services the comparator plans provided" (citation omitted)).[4]

Since filing their briefs, the parties have supplemented those briefs by filing myriad orders from district judges around the country who have addressed similar allegations regarding excessive recordkeeping fees. *See* ECF Nos. 43–49, 51, 55. Although no clear consensus has emerged, the majority of judges addressing specific allegations regarding the fungibility and commodification of recordkeeping services have found the excessive-fees claims to be plausible. *See, e.g., Seibert v. Nokia of Am. Corp.*, Civ. No. 21-20478 (ES) (AME), 2023 WL 5035026, at *7–9 (D.N.J. Aug. 8, 2023) (denying motion to dismiss on claim of breach of fiduciary duty where the complaint

---

[4]Contrary to defendants' assertion that *Hughes II* rested primarily on allegations of multiple recordkeepers and duplicative fees, the Seventh Circuit expressly noted that the breach was "not limited to a failure to consolidate recordkeepers. It includes a claim that Northwestern failed to mitigate excessive recordkeeping fees in several ways." *Hughes II*, 63 F.4th at 633.

alleged the fungibility of recordkeeping services and a competitive market); *Tolomeo v. R.R. Donnelley & Sons, Inc.*, No. 20-cv-7158, 2023 WL 3455301, at *4–5 (N.D. Ill. May 15, 2023) (same); *McDonald v. Lab'y Corp. of Am. Holdings*, No. 1:22-cv-680, 2023 WL 4850693, at *1, *5, *7 (M.D.N.C. July 28, 2023) (same); *Ruilova v. Yale-New Haven Hosp., Inc.*, No. 3:22-cv-00111-MPS, 2023 WL 2301962, at *3, *17–18 (D. Conn. Mar. 1, 2023) (same); *Mazza v. Pactiv Evergreen Servs. Inc.*, No. 22-cv-5052, 2023 WL 3558156, at *3–4 (N.D. Ill. May 18, 2023) (same); *but see Krutchen v. Ricoh USA, Inc.*, Civ. No. 22-678, 2023 WL 3026705, at *2 (E.D. Pa. Apr. 20, 2023) (denying motion to amend complaint because bare, vague allegations of fungibility of recordkeeping services was not enough to plausibly plead a breach); *Singh v. Deloitte LLP*, No. 21-cv-8458 (JGK), 2023 WL 4350650, at *4, *6 (S.D.N.Y. July 5, 2023) (same). Other orders have addressed more general claims of excessive recordkeeping fees, and those orders are more evenly divided between those that grant and those that deny motions to dismiss. *See Seibert*, 2023 WL 5035026, at *9 n.7 (collecting cases).

The Court finds the plaintiffs' allegations to be similar to the allegations addressed in *Hughes II* and in other cases that have allowed claims of excessive recordkeeping fees to survive motions to dismiss. Like those cases, the Court holds that plaintiffs have adequately pleaded that defendants breached their duty of prudence by allowing the Plan to incur excessive fees for RKA services.

2. Managed-Account-Service Fees

In support of their claim regarding excessive managed-account-service fees, plaintiffs identify six comparator plans. Am. Compl. ¶ 127. Plaintiffs allege that these "similarly-sized and smaller plans" purchased materially identical managed-account services as those purchased by the Plan, but at lower prices. *Id.* ¶ 126–28. Defendants argue that the proffered comparator plans fail to provide a meaningful benchmark. Defs.' Mem. 21. This time, the Court agrees with defendants.

First, in contrast to its allegations about the recordkeeping comparators, the amended complaint is devoid of even basic information about the managed-account-service comparators, such as the number of participants or total assets. Plaintiffs merely allege that the comparator plans are "similarly-sized or smaller," relying on the theory that smaller plans should have higher fees due to reduced market power. But mere assertions that plans are "similarly sized" are too vague and conclusory to allow the Court to "infer that the process was flawed." *Matousek*, 51 F.4th at 278 (quoting *Davis*, 960 F.3d at 482–83).

Second, the amended complaint lacks any well-pleaded allegations about the fee schedules of the comparator plans. Plaintiffs group the comparator plans' fee rates into three tiers, presumably to replicate the fee rate structure of the Plan. But plaintiffs fail to specify the range of account assets that corresponds to each of the tiers, and plaintiffs

fail to say whether those demarcators are uniform across comparator plans. In fact, one of the comparators does not follow a tiered-fee structure at all, which raises obvious questions about what exactly is being compared.

Third, the amended complaint lacks specific allegations about the managed-account services that are offered by the Plan or by any of the comparator plans. Even if the comparators' fee tiers roughly correspond to the Plan's, plaintiffs' allegations that managed-account-service providers "generally offer the same basic service" is insufficient. There are no allegations about the different "inputs," investment strategies, or risk profiles from which participants can choose, and that is true with respect to both participants in the Plan and participants in the comparator plans. As defendants point out, according to the GAO report cited in the amended complaint, managed-account providers "employ varying strategies to develop and adjust asset allocations for participants, incorporate varying types and amounts of participant information, and rebalance participant accounts at different intervals." U.S. Gov't Accountability Off. (GAO), *GAO-14-310, 401(k) Plans: Improvements Can Be Made to Better to Protect Participants in Managed Accounts* 14 (2014), https://www.gao.gov/assets/gao-14-310.pdf [https://perma.cc/4TM4-W5PE]. Without more information about what exactly the Plan

and the comparator plans offered to participants, there is no way to tell whether the Plan paid excessive fees for the particular managed-account services it purchased.[5]

Ultimately, the amended complaint lacks sufficient allegations about the sizes, fee rates, and types of managed-account services furnished to any of the identified comparator plans. On top of those (fatal) deficiencies, the alleged fee rates of two of the proposed comparator plans are from 2015, which is long before the beginning of the putative class period. In short, the amended complaint does not provide a meaningful benchmark that the Court can use as a "sound basis for comparison." *Matousek*, 51 F.4th at 278 (citation omitted). Plaintiffs' claim with respect to the managed-account-service fees is therefore dismissed.

### C. Failure to Monitor

Plaintiffs also claim breaches of fiduciary duty against U.S. Bank and its Board for failing to monitor the Committees in their administration of the Plan. Am. Compl. ¶ 8. Under ERISA, fiduciaries with the power to appoint and remove other fiduciaries

---

[5]Plaintiffs also submit that *any* managed-account-service fees are excessive because such services provide no marginal value over similarly performing, but lower cost, target-date funds that are also available to Plan participants. Am. Compl. ¶¶ 132–34. Although target-date funds and managed-account services might share some features—such as allocating assets based on age or risk tolerance—to compare the two is to compare "apples and oranges." *Davis*, 960 F.3d at 485 (rejecting comparison between index funds and actively managed funds because "it is not imprudent to provide options with differing features from which to choose, regardless of whether some perform better than others").

have a continuing duty to monitor the actions of their appointees. *Crocker v. KV Pharma. Co.*, 782 F. Supp. 2d 760, 787 (E.D. Mo. 2010) (citations omitted). But breach of the duty to monitor is a derivative claim that cannot succeed absent an underlying breach of the ERISA-imposed duties of prudence or loyalty. *See Allen v. Wells Fargo & Co.*, 967 F.3d 767, 777 (8th Cir. 2020). Because the Court has dismissed plaintiffs' claim for breach of the duty of prudence in connection with the managed-account-service fees, the corresponding claim for breach of the duty to monitor must also be dismissed. The claim for breach of the duty to monitor that corresponds to the claim regarding the recordkeeping fees will not be dismissed.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendants' motion to dismiss [ECF No. 32] is GRANTED IN PART and DENIED IN PART.

2. Defendants' motion is GRANTED with respect to claims II and IV of the amended complaint for breach of the duty of prudence with respect to managed-account-service fees and the derivative breach of the duty to monitor. Those claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

3.        Defendants' motion is DENIED in all other respects.

Dated: March 21, 2024

                                                      Patrick J. Schiltz, Chief Judge
                                                      United States District Court